18-1697-cr
*United States v. Weaver*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2020

No. 18-1697-cr

UNITED STATES OF AMERICA,
*Appellee,*

v.

CALVIN WEAVER,
*Defendant-Appellant,*

On Appeal from the United States District Court
for the Northern District of New York

ARGUED *EN BANC*: APRIL 20, 2021
DECIDED: AUGUST 16, 2021

Before: LIVINGSTON, *Chief Judge*, CALABRESI, CABRANES, POOLER, CHIN, LOHIER, CARNEY, SULLIVAN, BIANCO, PARK, NARDINI, MENASHI, *Circuit Judges*.[*]

———

NARDINI, *Circuit Judge*, filed the majority opinion, in which LIVINGSTON, *Chief Judge*, CABRANES, SULLIVAN, BIANCO, PARK, and MENASHI, *Circuit Judges*, joined in full.

LOHIER, *Circuit Judge*, filed an opinion concurring in the result, joined by CARNEY, *Circuit Judge*, except as to Part III.B.

POOLER, *Circuit Judge*, joined by CALABRESI and CHIN, *Circuit Judges*, filed a dissenting opinion.

CALABRESI, *Circuit Judge*, joined by POOLER and CHIN, *Circuit Judges*, filed a dissenting opinion.

CHIN, *Circuit Judge*, joined by CALABRESI and POOLER, *Circuit Judges*, filed a dissenting opinion.

———

[*] Judge Calabresi and Judge Chin, who are senior judges, participated in this case pursuant to 28 U.S.C. § 46(c) and 28 U.S.C. § 294(c).

2

This case presents what is, in some respects, a familiar question: whether a police officer's pat-down search of a suspect for weapons was reasonable under the Fourth Amendment. Based on the facts presented, we conclude that it was. We write *en banc* to confirm several fundamental, and well-settled, principles of Fourth Amendment jurisprudence. First, a police officer's verbal directives to a suspect do not transform a stop into a search when they do not amount to a physical trespass or intrusion into an area subject to a reasonable expectation of privacy, irrespective of any reasonable belief by a suspect as to whether a search is occurring. Second, a police officer's subjective intent bears no weight in determining when that officer's interaction with the suspect constitutes a search. Third, in evaluating whether an officer has reasonable suspicion that a suspect is armed, courts must look to the totality of the circumstances confronting the officer, as viewed objectively by a reasonable and cautious officer on the scene. When the circumstances give rise to

3

reasonable suspicion that a suspect has a weapon, an officer need not rule out alternative explanations—whether innocent or otherwise—for a suspect's behavior before deciding to conduct a pat-down for his safety.

We **VACATE** the panel decision and **AFFIRM** the judgment of the district court.

———

CARINA H. SCHOENBERGER, Assistant United States Attorney, *for* Antoinette T. Bacon, Acting United States Attorney for the Northern District of New York, Syracuse, NY, *for Appellee.*

JAMES P. EGAN, Assistant Federal Public Defender, Syracuse, NY, *for Defendant-Appellant.*

Alexandra A.E. Shapiro, Erin M. James, Shapiro Arato Bach LLP, New York, NY; Richard D. Willstatter, National Association of Criminal Defense Lawyers, White Plains, NY; Timothy P. Murphy, New York State Association of Criminal Defense Lawyers,

4

Buffalo, NY, *for* National Association of Criminal Defense Lawyers, New York State Association of Criminal Defense Lawyers, and New York Council of Defense Lawyers, *Amici Curiae in support of Defendant-Appellant.*

Jenn Rolnick Borchetta, The Bronx Defenders, Bronx, NY; Jin Hee Lee, Ashok Chandran, Mahogane Reed, NAACP Legal Defense and Educational Fund, Inc., New York, NY and Washington, D.C.; Christopher T. Dunn, New York Civil Liberties Union Foundation, New York, NY; Darius Charney, The Center for Constitutional Rights, New York, NY; Corey Stoughton, Steve Wasserman, The Legal Aid Society, New York, NY; Jonathan Moore, Luna Droubi, Beldock Levine & Hoffman LLP, New York, NY, *for* Stop-and-Frisk Class Counsel, *Amici Curiae in support of Defendant-Appellant*.

WILLIAM J. NARDINI, *Circuit Judge*:

This case presents what is, in some respects, a familiar question: whether a police officer's pat-down search of a suspect for weapons was reasonable under the Fourth Amendment. In concluding that the search here was reasonable, we break no new legal ground but rather reiterate well-settled constitutional principles and reject novel arguments to the contrary.

The defendant, Calvin Weaver, was frisked during a traffic stop in a neighborhood known for gun violence. The officer who frisked him, Officer Jason Tom, had just seen Weaver staring at the officers' unmarked police car and then visibly hitching up his pants as he got into a sedan. Later, officers encountered the sedan and pulled it over for a traffic violation. As Officer Tom approached the sedan, he saw Weaver slouched down in his seat, shifting and squirming, and using both hands to push down on his pelvic area, as if to conceal something. When ordered to stand outside the sedan with his hands on the trunk,

6

Weaver pressed his pelvis toward the car. During a pat-down, officers discovered that Weaver had a loaded semi-automatic pistol and baggies of cocaine hidden in his pants.

Weaver appealed his conviction for being a felon in possession of a firearm, entered in the United States District Court for the Northern District of New York (Glenn T. Suddaby, *C.J.*), on the grounds that the district court erroneously denied his motion to suppress the gun and drugs found during the search. In support, Weaver advanced several legally novel contentions. Specifically, he argued that in assessing whether reasonable suspicion existed, we are limited to analyzing his conduct before Officer Tom ordered him out of the car. He claimed that the order marked the moment the search began, both because Weaver would have reasonably thought he was being searched at that point, and because Officer Tom subjectively intended to search him when he gave the order. Weaver further contended that the facts known to the officers did not provide them

7

with reasonable suspicion that he had a weapon, as required by the Fourth Amendment in light of *Terry v. Ohio*, 392 U.S. 1 (1968). A divided panel of our Court agreed with Weaver's arguments and reversed the district court's denial of his motion to suppress the firearm and drug evidence.

Having agreed to rehear Weaver's appeal *en banc*, we now vacate the panel opinion, reject Weaver's novel legal contentions, as adopted by the panel majority, and write to confirm several fundamental principles of Fourth Amendment jurisprudence. First, a police officer's verbal directives to a suspect do not transform a stop into a search when they do not amount to a physical trespass or intrusion into an area subject to a reasonable expectation of privacy, irrespective of any reasonable belief by a suspect as to whether a search is occurring. Second, a police officer's subjective intent bears no weight in determining when that officer's interaction with the suspect constitutes a search. Third, in evaluating whether an officer

has reasonable suspicion that a suspect is armed, courts must look to the totality of the circumstances confronting the officer, as viewed objectively by a reasonable and cautious officer on the scene. When the circumstances give rise to reasonable suspicion that a suspect has a weapon, an officer need not rule out alternative explanations—whether innocent or otherwise—for a suspect's behavior before deciding to conduct a pat-down for his safety.

We therefore **VACATE** the panel decision and **AFFIRM** the judgment of the district court.

## I. BACKGROUND

This case concerns the constitutionality of a February 15, 2016, pat-down of the defendant, Calvin Weaver, through which officers of the Syracuse Police Department ("SPD") found a loaded pistol and cocaine. A federal grand jury in the Northern District of New York returned an indictment charging Weaver with one count of being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1), one count of

possessing a firearm with an obliterated serial number, 18 U.S.C. § 922(k), and one count of simple possession of a controlled substance, 21 U.S.C. § 844(a). Weaver moved to suppress the firearm and cocaine underlying the charges, arguing that they were discovered during an unconstitutional search. The district court held a suppression hearing on November 30, 2017, and denied Weaver's motion soon thereafter. On January 8, 2018, Weaver pleaded guilty to all three counts in the indictment. In the plea agreement, Weaver reserved his right to appeal the district court's denial of his motion to suppress. Weaver then appealed.

### A. Evidence at the Suppression Hearing

At the suppression hearing, the district court heard testimony from SPD Officer Jason Tom, as well as a second officer on the scene, Detective Gordon Quonce.[1]  Neither Weaver nor the third officer

---

[1] Officer Tom was promoted to Detective in January 2017.  Because he was an officer during the events at issue, we refer to him as Officer Tom.

involved in the traffic stop, Detective Greg Staub, testified. The court received five exhibits into evidence, including a map and photographs of the intersection where the search occurred, a photograph of the gun recovered from Weaver's pants, and a portion of the SPD's general rules and procedures manual.

The evidence presented at the hearing revealed the following: On February 15, 2016, Officer Tom and Detectives Quonce and Staub, all members of the SPD's gang violence task force, were in an unmarked police car with tinted windows patrolling a Syracuse neighborhood known as the Near West Side. At the time, Officer Tom had over six years of experience in the SPD and knew the Near West Side well; he had responded to homicides there, processed multiple homicide scenes in the area, and he knew of the neighborhood's high rate of shootings, homicides, and stabbings. Detective Quonce, a member of the SPD for eight years, was also familiar with the Near

11

West Side; he described it as "an open air drug market" with a "high volume of shots fired [and] gun-related crimes." App'x at 93–94.

Officer Tom testified that near dusk, around 5:00 p.m., the officers noticed a man, later identified as Weaver, walking alone "along the curb line" of Merriman Avenue. App'x at 150. The officers watched Weaver stare into the officers' car as they drove toward him, as they passed him, and as they drove away. Detective Quonce similarly testified that Weaver first came to the officers' attention because "as [they] were driving, he appeared to be staring at [their] vehicle. . . . longer than typically one would look at a vehicle," and he continued to stare as he stood at the passenger side of a gray sedan. App'x at 94–95. From the officers' sideview mirror, Officer Tom saw Weaver give an "upward tug" to his waistband before getting in the sedan. App'x at 152. The gray car drove off with Weaver.

Later, Detective Quonce saw the gray sedan again—this time, failing to timely signal before making a turn—and decided to pull the

car over.[2] Three men were in the car: the driver, a back-seat passenger, and a front-seat passenger—Weaver. When the sedan came to a stop, the rear driver's side door quickly swung open into traffic, causing Detective Quonce to fear that "the rear passenger was about to flee from the vehicle." App'x at 103. Officer Tom ordered the man to stay in the vehicle, and the man complied, closing the door behind him. The officers walked toward the car, with Detective Quonce on the driver's side and Officer Tom on the passenger's side.

During the traffic stop, Officer Tom recognized Weaver as the man who had previously watched the officers' car on Merriman Avenue. Officer Tom testified that he quickly grew suspicious of Weaver's unusual movements: "As I'm approaching the vehicle, from my vantage point I can see into the cabin of the vehicle clearly, I see

---

[2] New York law requires "[a] signal of intention to turn right or left [to] be given continuously during not less than the last one hundred feet traveled by the vehicle before turning." N.Y. Veh. & Traf. Law § 1163(b). Although Weaver questioned the applicability of the law to the driver's conduct before the district court, he does not challenge the legality of the stop on appeal.

the front passenger with both hands kind of pushing down on his pelvic area and squirming kinda in the seat left and right, shifting his hips." App'x at 158. Officer Tom thought Weaver was "trying to push something down" and was "concerned because it's abnormal that he's making these movements. . . . these pushing movements," and so he gave him a series of commands. App'x at 159. First, Officer Tom ordered Weaver to show his hands. Weaver complied and responded, "I don't got nothin'." App'x at 159. Next, Officer Tom had Weaver place his hands on his head, and Weaver complied. Officer Tom then asked for identification, and Weaver said it was in his right pants pocket. After surveying Weaver's pocket and determining that no large bulges were visible, Officer Tom instructed Weaver to slowly retrieve his identification card with his right hand. Finally, Officer Tom ordered Weaver out of the vehicle, without touching him in any

way—but with one hand on his holstered firearm because at that point, he was "suspicious of his actions." App'x at 162.[3]

While Detectives Quonce and Staub talked to the driver and back-seat passenger, Officer Tom directed Weaver to stand at the rear quarter panel of the car with his hands on the trunk and his feet spread apart. Weaver stood very close to the car, pressing his pelvic area only "a few inches" from the quarter panel. App'x at 163. From the other side of the car, Detective Quonce also noted that Weaver kept "moving his torso against the vehicle." App'x at 107. Officer Tom asked Weaver to step back, and Weaver resisted, claiming that the ground

---

[3] Judge Pooler's dissent asserts that Officer Tom "felt safe enough" to ask Weaver to retrieve his identification from his pocket, and then to place the identification into his own pocket. Pooler Dissenting Op. at 11. This conclusion lacks support in the record. At no point did Officer Tom testify that he felt "safe"; to the extent that the record discloses anything about Officer Tom's danger assessment, it shows that he had his hand on his holstered gun as he ordered Weaver out of the car because he was "suspicious" of Weaver's actions "at that time." App'x at 162. The dissent also states that placing Weaver's identification in Officer Tom's own pocket "necessarily required [Officer] Tom to momentarily shift his attention away from Weaver." Pooler Dissenting Op. at 11–12. Again, there is no evidence in the record suggesting that Officer Tom shifted his attention away from Weaver when placing the identification in his pocket; and certainly no more than he did when placing one hand on his gun.

15

was too slippery. Officer Tom saw nothing on the ground to make it slippery or otherwise to prevent Weaver from standing with his feet spread apart and his hands on the trunk of the car.

Once Weaver shuffled backward, Officer Tom began to physically pat down Weaver's clothes. With each touch, Weaver stepped forward, pressing his pelvis closer to the car. Officer Tom placed Weaver in handcuffs, pulled him away from the vehicle, and pat-frisked his waist and pockets. Officer Tom retrieved baggies of cocaine from Weaver's pocket, and felt the barrel of a firearm hidden in Weaver's groin area. Detective Quonce then came over and completed the pat-down, recovering a loaded semi-automatic handgun with a detachable magazine.

**B. The District Court's Decision**

On December 20, 2017, the district court denied Weaver's motion to suppress in a detailed twenty-page opinion. After summarizing the parties' arguments and concluding that the officers

16

had a reasonable suspicion of a traffic violation, the court turned its attention to the lawfulness of the frisk. Based on the entire record before it, including the officers' testimony at the suppression hearing, the court made the following factual findings: (1) The stop occurred in what was known to the officers to be a high-crime neighborhood. (2) The officers observed Weaver surveying their vehicle in a manner they found unusual. (3) Officer Tom saw Weaver pull up his waistband while walking. (4) When the officers stopped Weaver's car, the rear passenger opened his door in a manner that caused the officers to believe he might attempt to flee. (5) While approaching the vehicle, Officer Tom saw Weaver slouching in his seat and pushing down on his pelvic area with both hands while shifting his hips left to right, "as if he was attempting to conceal something in his pants." App'x at 218 (internal quotation marks omitted). (6) When Officer Tom told him to put his hands up, Weaver responded "I don't got nothing." App'x at 218 (internal quotation marks omitted). (7) When ordered outside the

17

vehicle, Weaver pressed his pelvis toward the car, which Officer Tom found "abnormal." App'x at 218 (internal quotation marks omitted).

The district court was careful to make its decision based on the totality of the circumstances facing Officer Tom at the time of the pat-down. It reasoned that some of the facts were insufficient, on their own, to create reasonable suspicion for a frisk. For example, the court explained that Weaver's "mere presence in a location known for criminal activity [was] insufficient" by itself to justify a frisk. App'x at 217. The court also rejected Weaver's argument that his "conduct after [he] exited the car must be ignored," finding "no legal authority" for the argument. App'x at 221. The court found that all the facts, when considered together, established that Officer Tom had a reasonable suspicion to believe that Weaver might be armed and dangerous, therefore justifying a pat-down.[4]

---

[4] Prior to his federal prosecution, Weaver was charged in state court with criminal possession of a weapon in the second degree in violation of New York Penal Law § 265.03(3). On June 29, 2016, the Onondaga County Court issued an

18

## C. The Appeal

On appeal, a divided panel of this Court reversed the district court's decision, concluding that the frisk violated the Fourth Amendment and that the firearm and cocaine should have been suppressed.[5]  In reviewing the record, the panel majority concluded that Officer Tom did not have a reason to believe that Weaver was

---

order suppressing the firearm evidence, concluding that Officer Tom lacked reasonable suspicion to conduct a pat-down.  The district court rejected Weaver's argument that it should reach the same conclusion as the County Court, reasoning that the County Court applied New York law as opposed to federal law; the testimony adduced at the County Court hearing was not the same as that adduced at the federal suppression hearing; and "a federal court is not required to give binding effect to a state court's factual or legal findings on issues related to federal constitutional law."  App'x at 223.  Weaver does not contend that it was improper for the district court to base its decision on the evidence presented during the suppression hearing.  Judge Pooler's dissent criticizes the majority for reaching a conclusion that is "contrary to the decision of the state court," Pooler Dissenting Op. at 4, but does not explain why we (or the district court, for that matter) should be bound by a decision of the Onondaga County Court.

The district court also concluded that it did not need to reach the question of whether the officers' seizure of cocaine from Weaver's pocket was unlawful because, once the firearm was properly seized during the pat-frisk, the officers would have inevitably discovered the cocaine.

[5] *See United States v. Weaver*, 975 F.3d 94 (2d Cir. 2020).

armed and dangerous.[6] "At most," the majority explained, "the officers had reason to believe that Weaver possessed something illicit."[7] The panel majority acknowledged that Supreme Court precedent "instructs us to turn a blind eye to an officer's subjective intentions in stopping, searching, or seizing" an individual, but adopted the novel position that "[i]t does not preclude [the Court] from looking at intent in determining *when* the action was initiated."[8]

The panel's dissenting member expressed concern that the panel majority's decision would send police officers and judges "into a new thicket of Fourth Amendment law."[9] The dissent found ample factual justification for a frisk and thought that the majority's focus on whether Weaver was hiding something "illicit . . . [but] not necessarily

---

[6] *See id*. at 100.

[7] *Id*. at 97.

[8] *Id*. at 102.

[9] *Id*. at 114 (Livingston, *C.J.*, dissenting) (quoting *Arizona v. Hicks*, 480 U.S. 321, 328 (1987)).

something dangerous" was inconsistent with long-standing principles of Fourth Amendment law.[10] The dissent further took issue with the majority's consideration of Officer Tom's subjective intent, finding that "Fourth Amendment precedent disfavor[ed]" any examination of an officer's subjective motivations.[11]

Pursuant to Federal Rule of Appellate Procedure 35(a), our Court ordered rehearing *en banc* on December 23, 2020, and heard oral argument on April 20, 2021.

## II. DISCUSSION

Weaver argues that Officer Tom lacked reasonable suspicion to believe that he was armed and dangerous. We disagree. Based on the totality of the circumstances confronting Officer Tom before he frisked Weaver, Officer Tom's frisk was supported by objective and particularized facts sufficient to give rise to a reasonable suspicion that

[10] *Id*. at 116.

[11] *Id*. at 114.

21

Weaver was armed and dangerous. We write to elucidate the circumstances confronting Officer Tom before he began to search Weaver and how those circumstances, taken together, demonstrate the reasonableness of the frisk under the Fourth Amendment.

## A. Standard of Review

When considering a ruling on a motion to suppress evidence, we review a district court's legal conclusions *de novo*, its findings of fact for clear error, and its decisions on mixed questions of law and fact, including whether there was reasonable suspicion to justify a frisk, *de novo*.[12] Because the resolution of a motion to suppress is necessarily fact-specific, we must "take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers."[13]

---

[12] *See United States v. Ganias*, 824 F.3d 199, 208 (2d Cir. 2016) (en banc); *see also United States v. Bershchansky*, 788 F.3d 102, 108 (2d Cir. 2015).

[13] *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

22

## B. Reasonable Suspicion to Conduct a Pat-Frisk

The Fourth Amendment protects "against unreasonable searches and seizures."[14] Warrantless searches and seizures are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."[15] The *Terry* investigative stop and frisk is one such exception.[16] In *Terry v. Ohio*, a plainclothes police officer noticed two men "hover about a street corner for an extended period of time," repeatedly walking past and staring into the same nearby storefront.[17] Worried that the men might be casing the store for a robbery, the officer approached them, "identified himself as a police officer[,] and asked for their names."[18] "When the men 'mumbled something' in response to his inquiries,"

---

[14] U.S. CONST. amend. IV.

[15] *Katz v. United States*, 389 U.S. 347, 357 (1967) (internal citations and footnote omitted).

[16] *See Terry v. Ohio*, 392 U.S. 1 (1968).

[17] *Id*. at 23.

[18] *See id*. at 6–7.

the officer grabbed one of the men, patted down the outside of his clothing, and found a .38-caliber revolver in his coat pocket.[19] The man challenged the constitutionality of both the stop and the frisk, arguing that the officer did not have probable cause to arrest him and thus should not have confronted or searched him.[20]

The Supreme Court upheld the stop and subsequent frisk, premising its decision on the realities of street-level law enforcement. As to the stop, the Court reasoned that the government's "general interest" in "effective crime prevention and detection" can outweigh the minor intrusion imposed by a police stop for questioning.[21] Accordingly, *Terry* gives us the rule that police officers may stop a person for investigative purposes when they have a "reasonable suspicion" that "a person they encounter was involved in or is wanted

---

[19] *Id*. at 7.

[20] *See id*. at 7–8, 15–16.

[21] *Id*. at 22.

in connection with a completed felony," even if that suspicion does not rise to the level required for probable cause.[22] Under the circumstances presented in *Terry*, the Court reasoned that "[i]t would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in th[e] same neighborhood to have failed to investigate [the petitioner's] behavior further."[23]

As for the *Terry* frisk, the Court required the same degree of certainty as it had used to evaluate the stop, though applied to a different question: A police officer must have a reasonable suspicion not only that criminal activity is afoot, but also that the person suspected is "armed and dangerous."[24] This further line of inquiry recognizes that a frisk is a more intrusive invasion of a person's

---

[22] *Vasquez v. Maloney*, 990 F.3d 232, 238–39 (2d Cir. 2021) (quoting *United States v. Hensley*, 469 U.S. 221, 227, 229 (1985)).

[23] *Terry*, 392 U.S. at 23.

[24] *Id*. at 30.

security than a stop.[25]  Nevertheless, the Court concluded that a frisk

was a "minor inconvenience and petty indignity" in light of "the need

for law enforcement officers to protect themselves and other

prospective victims of violence."[26]  The Court reasoned:

> We are now concerned with more than the governmental
> interest in investigating crime; in addition, there is the
> more immediate interest of the police officer in taking
> steps to assure himself that the person with whom he is
> dealing is not armed with a weapon that could
> unexpectedly and fatally be used against him.  Certainly
> it would be unreasonable to require that police officers
> take unnecessary risks in the performance of their duties.
> American criminals have a long tradition of armed
> violence, and every year in this country many law
> enforcement officers are killed in the line of duty, and
> thousands more are wounded.  Virtually all of these
> deaths and a substantial portion of the injuries are
> inflicted with guns and knives.[27]

In sum, the Court recognized that adherence to the probable cause

standard for pat-downs could leave on-the-beat police officers without

---

[25] *See id*. at 23–25.

[26] *Id*. at 10, 24 (internal quotation marks omitted).

[27] *Id*. at 23–24.

the tools they need to do their jobs safely and respond to quickly evolving situations. Since officers must take "necessarily swift action" based on "on-the-spot observations," *Terry* made room for a range of reasonable police responses depending on the circumstances.[28]

Since *Terry*, both the Supreme Court and our Court have reaffirmed the utility and necessity of the *Terry* stop and frisk. The Supreme Court has emphasized that the goal of the frisk is not "to discover evidence of crime," but to help law enforcement ascertain whether a suspect has a weapon "which might be used to harm the officer or others nearby."[29] In brief, a constitutional frisk based on reasonable suspicion "allow[s an] officer to pursue his investigation without fear of violence."[30]

---

[28] *Id*. at 20.

[29] *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (internal quotation marks and citation omitted).

[30] *United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008) (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)).

The reasonable suspicion standard is "not high."[31] It merely requires that a police officer "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion [on the citizen's liberty interest]."[32] "Reasonable suspicion requires less than the 'fair probability' of wrongdoing needed to support probable cause, and it can 'arise from information that is less reliable.'"[33] In determining whether an officer has an "objective" basis for his conduct,[34] the Court must "view the totality of the circumstances through the eyes of a reasonable and cautious officer on the scene, whose insights are necessarily guided by the officer's experience and training[,]"[35] as well as "commonsense

---

[31] *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (quoting *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997)).

[32] *Terry*, 392 U.S. at 21.

[33] *Vasquez*, 990 F.3d at 239 (quoting *Padilla*, 548 F.3d at 186–87, and then *Alabama v. White*, 496 U.S. 325, 330 (1990)).

[34] *Terry*, 392 U.S. at 21.

[35] *United States v. Santillan*, 902 F.3d 49, 56 (2d Cir. 2018).

judgments and inferences about human behavior."[36]  A "mosaic" of factors can contribute to a basis for reasonable suspicion, including, among other things, the suspect's behavior, the context of the stop, and the crime rate in the area.[37]  The Supreme Court has "consistently recognized that reasonable suspicion 'need not rule out the possibility of innocent conduct.'"[38]

An "officer's action must be justified at its inception."[39]  Thus, when reviewing the constitutionality of a frisk for weapons, the Court must examine the facts that preceded the frisk.  As with many police encounters, "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

---

[36] *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).

[37] *Ornelas*, 517 U.S. at 698.

[38] *Navarette v. California*, 572 U.S. 393, 403 (2014) (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)).

[39] *See Glover*, 140 S. Ct. at 1191 (internal quotation marks omitted); *see also Terry*, 392 U.S. at 18–19 (explaining that a search must be reasonable "at its inception").

evolving."[40]  When responding to "swiftly developing situation[s],"[41]

officers need not ignore developments that confront them.  "The

standard takes into account the totality of the circumstances—the

whole picture."[42]

### 1.    The Search's Inception

In order to determine whether the facts preceding the search

provided reasonable suspicion to conclude that Weaver was armed,

we must first consider when the search began.  Weaver argues that we

must ignore his conduct outside the car because, in his view, the search

---

[40] *Graham v. Connor*, 490 U.S. 386, 397 (1989) (discussing the reasonableness standard in a Fourth Amendment excessive force case).

[41] *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

[42] *Navarette*, 572 U.S. at 397 (internal quotation marks omitted).  Judge Calabresi's dissent suggests that judges rationalize our acceptance of pretextual stops because "we ourselves do not feel the cost" of them and "[w]e are not the ones who are stopped and made to spread eagle."  Calabresi Dissenting Op. at 12.  But it is equally true that we are not exposed to the same dangers faced by police officers during traffic stops, and we would not personally "feel the cost" of preventing police from adopting prudent safety measures.  Nor do judges commonly reside in neighborhoods beset by violent crime.  Indeed, whether in the Fourth Amendment context or otherwise, it is an occupational reality that judges rarely find themselves in situations confronted by those affected by our decisions.

began when Officer Tom ordered him to stand with his hands on the car trunk and his feet spread apart. For the reasons explained below, however, we hold that Officer Tom did not begin to search Weaver until he physically patted him down. While Weaver's repeated pressing of his body against the car *after* Officer Tom laid his hands on Weaver thus does not factor into the calculus of whether Officer Tom had reasonable suspicion to conduct a search, Weaver's initial unusual behavior outside the car quite properly factors into our analysis.[43]

The Supreme Court has articulated two tests for determining whether a police officer's conduct constitutes a "search" for purposes of the Fourth Amendment: whether the police officer *"physically intrud[es]* on a constitutionally protected area" and, if not, whether the

---

[43] The district court found as a fact that when Officer Tom "attempted to begin the frisk, Defendant pressed his pelvis against the vehicle multiple times." App'x at 218. Although the district court did not parse this finding with greater specificity, it is clear from the record that Weaver attempted to press his body against the car three separate times—the first of which occurred prior to Officer Tom touching Weaver to begin the frisk.

officer violates a person's "reasonable expectation of privacy."[44] The latter test focuses not on "the presence or absence of a physical intrusion,"[45] but instead on whether "the government violates a subjective expectation of privacy that society recognizes as reasonable."[46] In both cases, however, the police officer must objectively violate a person's privacy interests for his conduct to qualify as a "search."

It is beyond dispute that Weaver has a right to the security of his person,[47] and that under the "physical intrusion" standard, a search occurred when Officer Tom's hands physically came into contact with Weaver during the frisk.[48] The question before us, however, is

---

[44] *United States v. Jones*, 565 U.S. 400, 406 & n.3 (2012) (emphasis added); *see also Katz*, 389 U.S. at 360 (Harlan, *J.*, concurring).

[45] *Katz*, 389 U.S. at 353.

[46] *Kyllo v. United States*, 533 U.S. 27, 33 (2001).

[47] U.S. CONST. amend. IV.

[48] As *Terry* itself explains, a frisk is "a limited *search* of the outer clothing for weapons." *Terry*, 392 U.S. at 24 (emphasis added).

whether the search began earlier, when Officer Tom ordered Weaver to position himself at the back of the car. It did not. Neither Officer Tom's verbal command to place Weaver in a position where a frisk might occur, nor his as-yet-unexecuted intention to conduct a frisk, produced any invasion of a private and constitutionally protected area, whether based on physical trespass or a reasonable expectation of privacy. Officer Tom had not yet placed his hands anywhere on Weaver's person where a weapon might be detected and, when Weaver positioned himself at the back of the car, he did not reveal anything not already exposed to the public.

### a. The Command

Weaver largely ignores the privacy inquiry in Fourth Amendment search analysis, arguing that "a search of a person always begins when, viewed objectively, an officer pursues a course of action . . . such that a reasonable person would believe he is being subjected to a search." Appellant's *En Banc* Br. at 33. According to

33

Weaver, the only possible reason an officer might order a person to position himself at the back of a car is to search him.[49]  The command (so says Weaver) thus marks the moment a search begins.

Weaver's novel theory wrongly conflates the doctrines of search and seizure.  To be sure, under Fourth Amendment seizure law, "a person has been 'seized' . . . if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."[50]  But the search context is different, and

---

[49] To this end, Weaver repeatedly characterizes the posture he was ordered to take as the "in search" position, but that is only an argumentative label that he espouses as part of his litigation position.  *See, e.g.*, Appellant's *En Banc* Br. at 33.

[50] *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also Torres v. Madrid*, 141 S. Ct. 989, 1001 (2021) (discussing seizure by "acquisition of control"). Telltale signs of a "seizure" or "stop" include the "presence of several officers, the display of a weapon by an officer, some physical [unsearching] touching of the person . . . , or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."  *See Mendenhall*, 446 U.S. at 554.  A seizure may also occur if an officer "appli[es] . . . physical force to the body of a person" that "*objectively* manifests an intent to restrain," "even if the force does not succeed in subduing the person."  *Torres*, 141 S. Ct. at 993–94, 998 (holding that "a seizure occurs when an officer shoots someone who temporarily eludes capture after the shooting").

34

this is a case about searches, not seizures.[51]   The question is not

whether a reasonable person would have believed that he was being

searched.    The inquiry focuses instead on whether the police

committed a physical trespass into a protected area, or whether they

otherwise violated the person's reasonable expectation of privacy.

Here, Officer Tom's order constituted neither a trespass nor such an

intrusion.  Thus, it did not constitute a search.[52]

If Weaver's position were accepted, it would call into question a

host of sensible safety measures that in no way constitute searches.

The dangers of traffic stops—to both police officers and individuals—

---

[51] Of course, the parties (and the case law) agree that Weaver, the driver, and the back-seat passenger were seized from the moment the police stopped their vehicle.  *See, e.g.*, *Brendlin v. California*, 551 U.S. 249, 255 (2007).

[52] We do not foreclose the possibility that, in certain circumstances, a police officer might effectuate a search through a verbal command, without physically touching a person.  But that is not the case here.  And to be clear, we do not suggest that a verbal command itself can constitute a search, *contra* Pooler Dissenting Op. at 23, if it does not result in a trespass or a violation of a reasonable expectation of privacy.  *Cf. California v. Hodari D.*, 499 U.S. 621, 626–29 (1991) (holding that seizure did not occur where suspect fled rather than comply with police order to stop); *see also infra* at 43–44.

are well known and long recognized. The Supreme Court has explained that traffic stops "are especially fraught with danger,"[53] and that in most police encounters, "[t]he risk of harm to both the police and the [suspects] is minimized if the officers . . . exercise unquestioned command of the situation."[54] Thus, as part of a lawful stop, a police officer may take reasonable steps to ensure safety. He may order the driver and passengers out of the car, even if he does not have a reason to search the car or its occupants.[55] Depending on the circumstances, he may handcuff a suspect, secure him in the back of a patrol car, or order him to lie on the ground, move to another location, stand against a wall, or—as here—stand with his hands on the trunk of a car.[56] Each of these measures may be appropriate to minimize

---

[53] *Michigan v. Long*, 463 U.S. 1032, 1047 (1983).

[54] *Michigan v. Summers*, 452 U.S. 692, 702–03 (1981).

[55] *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977); *see also Maryland v. Wilson*, 519 U.S. 408, 410, 413–15 (1997) (extending *Mimms* to passengers).

[56] *See, e.g.*, *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (holding that the plaintiff's "handcuffing was an 'investigatory detention' (otherwise known as a

safety risks, prevent a suspect's flight, or secure a scene generally.

Each of these measures can be challenged for being unreasonable

under the circumstances or for transforming a *Terry* stop (which must

be supported by reasonable suspicion of criminal activity) into a *de*

'*Terry* stop') that never ripened into an arrest and was supported by reasonable suspicion"); *United States v. Gori*, 230 F.3d 44, 46, 56 (2d Cir. 2000) (finding that lining up apartment occupants against a wall was reasonable under the circumstances and collecting cases for the proposition that "officers may ask (or force) a suspect to move as part of a lawful *Terry* stop"); *see also United States v. Thomas*, 997 F.3d 603, 615 (5th Cir. 2021) (holding that under the circumstances, "the officers' drawing their firearms, ordering [the suspect] to the ground, and handcuffing him" behind his back was reasonable and did not convert the stop into an arrest until he was frisked); *United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014) (characterizing the defendant's action—"putting his hands on the car when told to do so by the police"—as a seizure); *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000) (detaining woman in the back of a police car was a reasonable form of intrusion before she was arrested).

*facto* arrest (which requires probable cause).[57]   None transforms a

"seizure" into a "search."[58]

---

[57] Weaver also argues that his placement at the rear of the car independently required reasonable suspicion that he was armed and dangerous.  Because he did not raise this argument before the district court, we review this claim only for plain error.  *See United States v. Cacace*, 796 F.3d 176, 190 (2d Cir. 2015) (reviewing newly raised Fourth Amendment claim only for plain error, namely: error, that is plain, that affects the defendant's substantial rights, and that seriously affects the fairness, integrity, or public reputation of judicial proceedings).  His claim fails at the first prong of plain-error review because there was no error (plain or otherwise) in the district court's failure to find a Fourth Amendment violation based on this additional argument.  As noted in the text, officers are entitled to take reasonable precautionary measures during traffic stops to ensure the safety of themselves and others.  Just as the order for Weaver to get out of the car was clearly authorized by *Maryland v. Wilson*, the marginally greater intrusion of having him put his hands on the trunk with his feet spread apart was supported by the facts that justified the subsequent frisk, *see infra* Section II.B.2 (minus, of course, Weaver's standing unusually close to the car, which came after the direction to place himself there).  If nothing else, Weaver's pushing down on his pants with both hands, while slouching down in the passenger seat, as Officer Tom approached, certainly warranted placing Weaver in a position where his hands were in a controlled and clearly visible place in order to ensure officer safety.

[58] Nor did the measures the officers took during the traffic stop constitute an "additional seizure," Calabresi Dissenting Op. at 15, that had to be "independently supported by adequate, individualized suspicion," *id.* at 22, that he was armed and dangerous and therefore could justifiably be subjected to a *Terry* frisk, *id.* at 18–19.  Weaver was not seized multiple times; he was seized once, when the police stopped the car in which he was riding.  *See Brendlin*, 551 U.S. at 254 ("A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied." (internal quotation marks, citations, and emphasis omitted)); *id.* at 257 (holding that passenger, like driver, is seized during traffic

In short, we hold that a police officer's verbal directives to a suspect do not transform a "stop" into a "search" unless the officer committed a physical trespass into a constitutionally protected area or otherwise violated the person's reasonable expectation of privacy; and that it is irrelevant whether the suspect reasonably believed that he was being searched. Officer Tom directed Weaver to get out of the car and stand with his hands on the trunk. In doing so, Weaver suffered no physical intrusion into a protected area, and he was not forced to

stop). The dissent's citations to various cases holding that *pedestrians* were "seized" when they complied with police commands to place their hands on a nearby vehicle are not to the contrary; there is no dispute that Weaver, as a passenger in the stopped car, was already seized by the time he was ordered to the back of the sedan. *See* Calabresi Dissenting Op. at 17–18 (collecting cases). Rather than as a separate seizure, which had to be justified as though it were a stand-alone *Terry* stop, Weaver's placement by the back of the car was an "additional intrusion" into his liberty during an ongoing seizure. *See Wilson*, 519 U.S. at 415 (holding "that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop" because "the additional intrusion on the passenger is minimal"); *see also Muehler v. Mena*, 544 U.S. 93, 99 (2005) ("The imposition of correctly applied handcuffs on Mena, who was already being lawfully detained during a search of the house, was undoubtedly a separate intrusion in addition to detention in the converted garage."). But that intrusion was reasonable to ensure officer safety in the circumstances here.

39

reveal anything that was not already exposed to the public.[59] Only once Officer Tom started physically patting down Weaver's clothes did he effect a search under the Fourth Amendment.

---

[59] Judge Pooler's dissent contends that Weaver's placement with his hands on the trunk and his legs spread apart constituted a search because it intruded into his "reasonable expectation of privacy," for two reasons. Pooler Dissenting Op. at 24.

First, the dissent argues that an order to stand "spread eagle" is a search because it is "'degrading,'" that is, "'uncomfortable and undignified.'" *Id.* (quoting amicus brief). In support, it quotes the Supreme Court's decision in *Safford Unified School District No. 1 v. Redding*, 557 U.S. 364, 374–75 (2009), for the proposition that "[a] person's 'subjective expectation of privacy' can be 'inherent in [their] account of [an official action] as embarrassing, frightening, and humiliating.'" Pooler Dissenting Op. at 24. But this omits key language. The full quotation reads: "[The plaintiff's] subjective expectation of privacy *against such a search* is inherent in her account of it as embarrassing, frightening, and humiliating." *Safford Unified Sch. Dist. No. 1*, 557 U.S. at 374–75 (emphasis added). It is clear that the Supreme Court described the plaintiff's reaction not to conclude that a search had actually occurred (that is, that there had been an intrusion), but instead to determine whether something they had already determined to be a search (there, a strip search of a student) had crossed into a constitutionally protected area. The Court expressly differentiated between "a search, and the degradation its subject may reasonably feel." *Id.* at 377.

Second, the dissent contends that Weaver's stance against the trunk "may seem more exposed and revealing than displaying contents of one's pockets or the skin of one's torso." Pooler Dissenting Op. at 24. But the dissent does not tell us what, precisely, was "exposed" or "reveal[ed]." The record before us does not suggest that anything was.

40

### b. Officer Intent

Weaver also argues that the search began upon Officer Tom's order because the only possible reason an officer might order a person to position himself at the back of a car is to search him. He claims that "when an officer takes affirmative actions—ordering a passenger to assume an 'in search' position—[the officer] objectively signal[s] the beginning of an investigation for weapons." Appellant's *En Banc* Br. at 40. This is incorrect for the reasons we stated earlier: What objectively demonstrates a search is an officer's physical trespass on a protected area or violation of a reasonable expectation of privacy. Since Officer Tom's actions did not produce any invasion of a private and constitutionally protected area, whether based on physical trespass or a reasonable expectation of privacy, they did not constitute a search.

Despite his claims to the contrary, we also interpret Weaver's argument as an inappropriate attempt to slip an officer's subjective

intent into our Fourth Amendment analysis. We reject the effort and hold that a police officer's subjective intentions bear no weight in determining whether a search has occurred.[60]

The Supreme Court has long rejected any attempt to inject subjectivity into the Fourth Amendment context.[61] "[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent [of the

---

[60] For the reasons stated, we therefore reject *en banc* the panel majority's holding that a court may "look[] at intent in determining *when* the [search] was initiated." *Weave*r, 975 F.3d at 102.

[61] *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019) ("In the Fourth Amendment context, however, we have almost uniformly rejected invitations to probe subjective intent." (internal quotation marks omitted)); *Kentucky v. King*, 563 U.S. 452, 464 (2011) ("The reasons for looking to objective factors, rather than subjective intent, are clear."); *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) ("The officer's subjective motivation is irrelevant."); *Bond v. United States*, 529 U.S. 334, 338 n.2 (2000) ("The parties properly agree that the subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment."); *Whren v. United States*, 517 U.S. 806, 813 (1996) ("[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers . . . ."); *Graham*, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force . . . .").

officer]."[62]  Accordingly, "[t]he existence of a pretext for a *Terry* stop does not render invalid an otherwise constitutional search."[63]

As for understanding when a search began, an officer's subjective intent is likewise of no moment.  Not only are there a host of reasons why an officer might order a person to get out of a car and to stand in a particular place or in a particular position—a number of safety-related reasons come to mind—Weaver identifies no precedent suggesting that an officer's intent is relevant to the question of when a search begins, and he fails to explain how an officer's intent to search

---

[62] *Whren*, 517 U.S. at 814.  Both Judge Calabresi's and Judge Pooler's dissents spend considerable time criticizing the Supreme Court's decision in *Whren*.  *See* Calabresi Dissenting Op. at 11–12; Pooler Dissenting Op. at 24–29.  But they do not dispute that *Whren* is binding precedent, which we are required to apply unless and until the Supreme Court tells us otherwise.  *See, e.g.*, *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("[I]t is this Court's prerogative alone to overrule one of its precedents."); *see also* Concurring Op. at 12–18 (criticizing *Whren* but acknowledging its applicability here).  Moreover, *Whren* is entirely consistent with a long line of decisions in which the Court has explained that "evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer." *Horton v. California*, 496 U.S. 128, 138 (1990).

[63] *United States v. Scopo*, 19 F.3d 777, 783 (2d Cir. 1994) (internal quotation marks omitted).

a suspect *actually effectuates* a search. Without an actual physical trespass or violation of a person's reasonable expectation of privacy, no search can have occurred. At best, Officer Tom's order was only a prelude to a frisk.

Consider the logical implications of Weaver's position that a search begins upon directing a person to position himself against a car. If Officer Tom had ordered Weaver into position and intended to search him but then never laid a hand on him, he was (in Weaver's view) still searched. If Officer Tom had ordered all three occupants of the car into that position, but frisked only one of them, Weaver's position dictates the conclusion that Officer Tom searched them all. If an officer were to order three people to position themselves alongside a car, but one immediately fled the scene never to be found again, the officer still frisked the runaway. The illogic of this last proposition is particularly glaring because the Supreme Court has held that when a suspect flees instead of complying with a police order to stop, he has

not been seized.[64]  Thus, Weaver's position would yield the incoherent

conclusion that the runaway was never subjected to a *Terry* stop but

was subjected to a *Terry* frisk.  We therefore reject any attempt to

consider an officer's intentions when determining when a search

commences under the Fourth Amendment.[65]

### 2. The Search's Reasonableness

Having determined that Officer Tom began to search Weaver

when he physically touched him, we turn to the facts known to the

officers, and the reasonable inferences that could be drawn from those

---

[64] *See Hodari D.*, 499 U.S at 626–29.

[65] Judge Calabresi's dissent proposes that a "district court *should expressly* consider the officers' motivation in making [a] pretextual stop and everything that led up to it."  Calabresi Dissenting Op. at 24.  The dissent would apparently require district courts to articulate specific conclusions about an officer's motivations for making a stop before making credibility findings regarding that officer's testimony—that is, whether he is a "reliable witness." *Id.* at 22.  But there is nothing about a pretextual stop that inherently calls into question the veracity of an officer's testimony.  As with all witnesses, district courts are charged with considering any number of factors when assessing truthfulness, such as consistency, plausibility, motive, and demeanor.  We have never required district courts to tick off boxes on a special credibility checklist for witnesses, much less for officers involved in traffic stops.  We decline to embark on such a project today.

facts, at that point in time. Based on the circumstances confronting Officer Tom before he frisked Weaver, we hold that Officer Tom's frisk of Weaver was supported by objective and particularized facts that gave rise to a reasonable suspicion that Weaver was armed and dangerous. Neither party challenges the facts as the district court found them, and upon review of the record, we find no clear error in the district court's factual findings or, indeed, any error at all in its well-reasoned and thorough analysis.

We begin with the most powerful evidence: by the time Officer Tom frisked Weaver, he had *thrice* witnessed Weaver make suspicious movements concentrated around his waist and pelvis, where a firearm might easily be concealed. First, while walking along Merriman Avenue, Weaver gave a noticeable "upward tug" to his waistband. App'x at 152. [66] Next, during the traffic stop, Weaver "slouched down"

---

[66] Both Judge Calabresi's and Judge Pooler's dissents assert that the officers had made up their mind to search Weaver well before they had reasonable suspicion to do so. *See* Calabresi Dissenting Op. at 4 ("To the ordinary observer, it

and "shift[ed] his hips" in his seat when Officer Tom approached the car, using two hands to "push[] down his pelvic area" as though he was trying to conceal something. App'x at 158. Later, after Officer Tom ordered Weaver to get out of the car and stand with his hands on the trunk and his feet spread apart, Weaver stood unusually close to the vehicle, pressing his pelvis only "a few inches" from the quarter panel. App'x at 163.[67] These actions, viewed in relatively quick succession by Officer Tom, formed the primary basis for his reasonable

would be obvious that Officer Tom decided to search Weaver long before he ever laid hands on him."); Pooler Dissenting Op. at 18–19 ("Weaver's fate was sealed the moment these officers laid eyes on him."). Similarly, Judge Chin's dissent states that after Weaver got into the sedan, "[t]he officers followed in their car." Chin Dissenting Op. at 1. This disregards the uncontroverted testimony of the officers that, after seeing Weaver get into the gray sedan on Merriman Street, they did not stop it or follow it. Instead, the officers proceeded east and turned right onto Sabine Street; in their rear-view mirror, they saw the gray sedan drive away and turn, passing out of the officers' sight. App'x at 153. The officers re-encountered the sedan on Davis Street. *Id.* As Detective Quonce testified, they "hadn't been actively looking for [the grey sedan]" and "[i]f we came across it, we came across it. If we didn't, we didn't." App'x at 134. The stop occurred only after the officers saw the sedan's driver commit a traffic violation.

[67] Judge Pooler's dissent states that the majority "tortures the English language" by describing Weaver's standing in unusually close proximity to the car as a "movement." Pooler Dissenting Op. at 11 n.1. It is not clear how else Weaver could have got out of the car and placed himself into that position, if not by moving.

47

suspicion that Weaver was hiding something dangerous on his person, in particular around his waistline.

Unusual, evasive, or furtive behavior, especially in the presence of law enforcement, is often a critical factor in the reasonable suspicion analysis.[68] We use the term "furtive" advisedly here to describe specific testimony credited by the district court—indeed, uncontradicted in the record—that Weaver engaged in conduct suggesting that he was hiding something from the police. When the officers drove by, Weaver hitched his pants before entering the gray

---

[68] *See Wardlow*, 528 U.S. at 124 ("In this case, . . . it was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police. Our cases have . . . recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *see also Santillan*, 902 F.3d at 57 (finding nervous behavior and avoidance of eye contact factors that support reasonable suspicion); *Padilla*, 548 F.3d at 187 (upholding suspicious manner of walking as a factor supporting reasonable suspicion); *United States v. Paulino*, 850 F.2d 93, 97–98 (2d Cir. 1988) (upholding search for weapons under car floor mat after the defendant was observed making furtive movement in that direction). *Cf. Dancy v. McGinley*, 843 F.3d 93, 110 (2d Cir. 2016) (finding no reasonable suspicion in part because the defendants "did not . . . appear[] nervous, attempt[] to conceal anything, change[] direction, r[un] away, quicken[] their pace, or ma[ke] furtive gestures").

sedan. It is a reasonable inference that an "upward tug" may be needed to counteract the downward pull of something else, and it takes no specialized expertise to understand that a firearm would be weighty enough to do just that. During the traffic stop, Officer Tom noticed that Weaver was slouching in his seat (suggesting that he was trying to minimize his visibility as the officer approached), squirming and pushing down on his pelvis (suggesting that he was trying to hide something in his pants), and doing so with two hands (suggesting that he was putting a fair bit of effort into this attempt at concealment, and that the object was large enough to need that much effort to shift around). Moreover, Weaver reflexively denied having anything—a response that was plainly contradicted by his actions. Finally, Weaver's unusual behavior outside the car reasonably suggested that he was trying to impede Officer Tom from conducting a pat-down of the area that he was keeping so close to the car. Having just seen Weaver squirming in his seat and pushing down on that same part of

49

his body, Officer Tom now had even stronger indications that Weaver was trying to hide a weapon in his pants. In the eyes of a "trained police officer who has witnessed similar scenarios numerous times before," and indeed even to the untrained eye, Weaver's actions were unquestionably cause for alarm.[69]

Acknowledging that his conduct was suspicious, Weaver nevertheless argues that even if "it may have been reasonable for Officer Tom to suspect [him of] trying to hide something, there was no reason to believe he was hiding something dangerous." Appellant's *En Banc* Br. at 52. But as the Supreme Court has held, the reasonable suspicion standard does not require officers to "rule out the possibility of innocent conduct" before responding to the circumstances

---

[69] *United States v. Oates*, 560 F.2d 45, 61 (2d Cir. 1977); *see also Ornelas*, 517 U.S. at 700 ("To a layman the sort of loose panel below the back seat armrest in the automobile involved in this case may suggest only wear and tear, but to [the officer], who had searched roughly 2,000 cars for narcotics, it suggested that drugs may be secreted inside the panel.").

confronting them.[70]  In *United States v. Arvizu*, for example, a defendant

challenged the existence of reasonable suspicion for an investigatory

stop of his vehicle, claiming that his conduct (driving a minivan with

children in the backseat through a remote area of Arizona) was just as

consistent with innocent conduct (a family "holiday outing") as it was

with criminal activity (transporting over 100 pounds of marijuana).[71]

The Court reasoned that while some of the facts were "susceptible of

innocent explanation," others were not,[72] and taken together, the facts

"sufficed to form a particularized and objective basis for  [the stop]."[73]

---

[70] *Navarette*, 572 U.S. at 403 (quoting *Arvizu*, 534 U.S. at 277).

[71] *Arvizu*, 534 U.S. at 277; *see also id*. at 268.

[72] *Id.* at 277–78.  The Court also considered that the children's seats seemed "unusually high, as if their feet were propped up on some cargo on the floor[;]" that the kids waved at the officer in an "abnormal pattern . . . as if [they] were being instructed[;]" and that the minivan was on a "little-traveled route" often used by smugglers to avoid border patrol checkpoints.  *Id*. at 270, 271, 277.

[73] *Id*. at 277–78.

While "each of [a] series of acts" can be "innocent in itself," they may together "warrant[] further investigation."[74]

If officers need not rule out the possibility of *innocent* conduct to have reasonable suspicion, they certainly do not need to rule out the possibility of other *nefarious* conduct. Just so here. Weaver's focused movements around his waist and pelvis might conceivably have involved illegal activity that was not hazardous to Officer Tom's safety; Weaver could have been trying to hide illegal narcotics, for example. But given the situation, there was good reason to believe that his movements suggested that he was hiding something dangerous. A police officer, placed into an uncertain and developing situation, is not

---

[74] *Id*. at 274 (quoting *Terry*, 392 U.S. at 22). This is a proposition of long standing in the context of the Fourth Amendment. *See, e.g.*, *United States v. Delossantos*, 536 F.3d 155, 161 (2d Cir. 2008) ("[W]e cannot discount facts one by one simply because [the defendant] has suggested hypothetical explanations for them that are consistent with his innocence."); *id.* ("'[I]nnocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens demands.'" (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983))); *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) ("The fact that an innocent explanation may be consistent with the facts alleged, however, does not negate probable cause.").

tasked with sorting through multiple possible scenarios and conducting a frisk for weapons only if that is the sole, or even the most likely, possibility. The Supreme Court has told us that an "officer need not be absolutely certain that the individual is armed."[75] The purpose of a protective search is to allow an officer to do his job safely,[76] and so the only question for Fourth Amendment purposes is whether the officer's basis for thinking that the suspect might be carrying a weapon rises to the level of reasonable suspicion. And context is king in Fourth Amendment analysis. Here, Weaver's conduct, taken in context, gave rise to a reasonable suspicion that he was armed.

For one, the circumstances of the traffic stop suggested that the vehicle's occupants might be dangerous. Once the sedan reached the side of the road, the backseat passenger "quickly" opened his door,

---

[75] *Terry*, 392 U.S. at 27.

[76] *See id*. ("[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.").

53

"into traffic." App'x at 103. The officers thought the man was trying to flee upon being stopped by the police, and Officer Tom grew alarmed, finding the man's actions unusual in his experience with traffic stops. He quickly and forcefully ordered the man not to move and tried to take control of the scene. It did not require a leap of logic for the police to surmise that the rear passenger had initially planned to flee—an intention that could surely give rise to suspicion that the passenger was interested in separating himself from someone, or something, in the car. Walking toward the sedan, Officer Tom noticed that it was occupied by three men. The "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car."[77] We need not wholly impute the rear passenger's conduct to Weaver to find that it was reasonable for Officer Tom to approach the car with heightened caution for his own safety, and that of his fellow officers.

---

[77] *Wilson*, 519 U.S. at 414.

Officer Tom's suspicions reasonably heightened when he recognized the front-seat passenger: Weaver was the man who had given a drawn-out look at the officers' car when they passed by moments earlier. Weaver caught Detective Quonce's attention because he stared at their police car "longer than typically one would look at a vehicle," App'x at 95, and Officer Tom testified that Weaver watched them "as [they] approached, as [they] passed, and . . . as [they] proceeded past him," App'x at 151. Now, the same man sat in front of him, shifting in his seat and pushing down on his pants. Weaver says that these facts are unhelpful because the police car was unmarked, and nothing in the record indicates that Weaver knew that the car was occupied by police officers. But counter-surveillance of covert police activity is relevant to assessing reasonable suspicion for both a stop and a frisk.[78] We evaluate the reasonableness of an officer's

---

[78] *See, e.g.*, *United States v. Garcia*, 339 F.3d 116, 119 (2d Cir. 2003) (considering counter-surveillance in a reasonable suspicion inquiry).

suspicion as of the time of the challenged search. Weaver's earlier staring at the passing car—now juxtaposed with his effort to push something down his pants when the police approached—was consistent with the inference that he was on the lookout for police precisely because he was engaged in criminal activity that might include possession of a weapon.[79] In general, a suspect's nervous and unusual behavior may appropriately pique an officer's suspicions[80]—especially when the officers, as here, are patrolling as members of a gang violence task force.

---

[79] As Chief Judge Livingston explained in her panel dissent in this case:

> [S]taring at an unmarked car in an attempt to discern its occupants is entirely consistent with being wary of a police encounter. And while Weaver's concern may have been justified by an innocent fear, Officer Tom could reasonably suspect that it was motivated by a fear of being stopped while possessing a gun and drugs—as Weaver ultimately was. The law does not require that police officers—or courts—make all inferences in favor of the suspect. Quite the opposite: we must "give due weight to inferences drawn . . . by . . . local law enforcement officers."

975 F.3d at 117 n.8 (quoting *Ornelas*, 517 U.S. at 699).

[80] *See Santillan*, 902 F.3d at 57.

Adding further context, the stop occurred in a high-crime neighborhood.  App'x at 93, 150.  Again, we do not use that term loosely or as a "substitute for analysis" of the record.[81]  Rather, the Supreme Court has made clear that "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."[82]  Officer Tom and Detective Quonce did not testify about generic "crime" in Syracuse, or even in the Near West Side.  In their respective six and eight years in the SPD, they knew the Near West Side specifically for gun violence.[83]  Detective Quonce

---

[81] *United States v. Freeman*, 735 F.3d 92, 101 (2d Cir. 2013) ("[T]he general label 'high crime area' is not a substitute for analysis of the underlying testimony.").

[82] *Wardlow*, 528 U.S. at 124; *Holeman v. City of New London*, 425 F.3d 184, 192 (2d Cir. 2005) ("In the middle of the night, the police were in a high crime area with a convicted narcotics felon who was acting suspiciously.  These facts alone suffice to support reasonableness.").

[83] Judge Pooler's dissent faults the majority for not identifying anything "in the record indicating that *the specific locations* where Weaver was first seen walking or where the car was stopped had any connection to crimes."  Pooler Dissenting Op. at 16 (emphasis added); *see also* Concurring Op. at 10 (arguing that boundaries of high-crime areas should be "narrowly circumscribed").  We are unaware of any cases requiring evidence that crimes had been committed on the precise stretch of

characterized the neighborhood as "dangerous," with a "high volume

of shots fired" and "gun-related crimes." App'x at 93. Officer Tom

added that "there's been multiple homicides, stabbings, [and]

shootings" in the area. App'x at 150. Both officers had responded to

homicides in the neighborhood. Officer Tom had processed multiple

homicide scenes there. Weaver attempts to downplay the realities of

the location by arguing that it was still light outside at the time of the

stop. Time of day is of course one factor that a police officer may

consider in assessing a situation, and officers may have good reason to

become more cautious at night due to a higher frequency of violent

---

road, or the specific intersection, where a suspect was stopped; and we see no reason to insist on such evidence. *See, e.g.*, *Arvizu*, 534 U.S. at 277 (relying on fact that stopped minivan was traveling a "route" favored by smugglers). Judge Pooler's dissent also argues that the majority "ignores research" suggesting that "[t]he racial composition of the area and the identity of the officer are stronger predictors of whether an officer deems an area high crime than the crime rate." Pooler Dissenting Op. at 16 (citation omitted). But the question at hand is whether the area *was in fact* afflicted by a high rate of crime, not whether an officer "deemed" it so. On this question of fact, the district court did not clearly err in relying on uncontradicted evidence that the Near West Side of Syracuse was indeed plagued by a high level of violent crime.

acts, or a greater risk of unseen dangers.[84] But there is no suggestion in the record that the shootings, homicides, or other illegal gun activity in this particular neighborhood were somehow limited to hours of darkness; and even if they were, there is no reason to infer that the guns involved in such violence somehow evaporated during the daytime, only to re-materialize at nightfall. Further, in this case, dusk was falling when Weaver's car was stopped. While an "individualized" inquiry is always required in a reasonable suspicion analysis,[85] it is objectively reasonable for an officer to be especially attuned to the possibility of guns in a neighborhood known for gun crime.[86]

---

[84] *See Padilla*, 548 F.3d at 188 (noting the time of day in the reasonable suspicion analysis).

[85] *Hartline v. Gallo*, 546 F.3d 95, 100 (2d Cir. 2008).

[86] The concurrence suggests that "a defendant's presence in a so-called 'high-crime area' has limited relevance in determining the reasonableness of a search," Concurring Op. at 1–2, and offers suggestions on how to "improve matters," *id.* at 8. We respond with several observations.

First, as our discussion makes clear, the fact that police stopped Weaver in a high-crime area—specifically, one characterized by a high rate of violence, including gun violence—is a significant factor that meaningfully contributed to the reasonable suspicion that he was armed. A description of this factor as of only "limited relevance" materially understates our holding.

Second, the concurrence argues that "officers may reasonably believe that an area has a high crime rate only if supported by data." *Id.* at 8. The issue at hand—that is, whether an area is actually characterized by a rate of crime that reasonably warrants a heightened fear that a suspect is armed—is a question of fact for the district court. First-hand knowledge of police officers who regularly patrol the relevant area is one logical source of evidence. *See Ornelas*, 517 U.S. at 700 ("[O]ur cases have recognized that a police officer may draw inferences based on his own experience . . . ."). Statistical data may likewise be offered—by the prosecution or the defense—but it is certainly not required.

Finally, the concurrence suggests that "police officers and courts should focus on recent and relevant criminal activity." Concurring Op. at 10. Wholly outdated crime rates from years ago are, indeed, unlikely to usefully inform an officer's *Terry* analysis. But crime rates are rarely linear, with short-term variations that may be attributable to any number of factors, even including the weather, and that accordingly may not alter the likelihood of a crime occurring or a weapon being possessed. The concurrence's suggestion that crime statistics be considerably narrowed, perhaps to the "last few weeks," *id.*, is unduly restrictive and would not adequately serve the Fourth Amendment's reasonableness inquiry. As for relevance, we agree that the type of crime can play a useful role in the *Terry* analysis. As we hold today, the fact that the Near West Side was characterized by violent crimes, including shootings and murders, materially contributed to reasonable suspicion that Weaver was armed. Reasonable suspicion of one crime might also be heightened by indications that related crimes are being committed in the area. *See, e.g., United States v. Alexander*, 907 F.2d 269, 273 (2d Cir. 1990) (upholding *Terry* frisk after car stop of suspect whom police witnessed engaging in narcotics transaction, explaining that "this Court has repeatedly acknowledged the dangerous nature of the drug trade and the genuine need of law enforcement agents to protect themselves from the deadly threat it may pose"); *Santillan*, 902 F.3d at 59 (upholding *Terry* frisk after concluding there was reasonable suspicion that defendant was engaged in drug crime; "Narcotics activity and weapons often

Viewing the circumstances in their totality, Officer Tom had a particularized and objective[87] basis for believing that Weaver might be armed and dangerous at the time he commenced his search.[88] We thus

---

go hand in hand"). Conversely, the absence of any logical link between crimes that are prevalent in a particular neighborhood and a suspect's possible weapon possession may reduce the degree to which location is relevant.

[87] Judge Pooler's dissent asserts that our inquiry "relies only on an officer's *subjective good faith belief* that an individual is armed and presently dangerous." Pooler Dissenting Op. at 18 (emphasis added). We do no such thing. Instead, we rely on "the facts known to the officers, and the reasonable inferences that could be drawn from those facts, at that point in time." *Supra* at 45–46.

Judge Chin's dissent argues that none of the factors we have considered provide any indication that Weaver was dangerous, and that "[z]ero plus zero is zero." Chin Dissenting Op. at 3 (internal quotation marks omitted). Although we agree with the arithmetic, that equation does not serve here because it does not account for what we have identified as the many relevant factors encountered by Officer Tom and Detective Quonce; it just conveniently rounds down the value of every suspicious factor to zero, leaving their sum preordained. As we have said before in a related context, even if "no individual fact might be sufficient to provide officers" with reason to believe something to be true, "the totality" of those facts can certainly reach the requisite level of suspicion. *United States v. Bohannon*, 824 F.3d 242, 257 (2d Cir. 2016) (holding that police had reason to believe subject of arrest warrant would be found in specified premises); *see id.* at 256 ("'[W]e cannot discount facts one by one' as soon as any weakness is identified or contrary explanation hypothesized." (quoting *Delossantos*, 536 F.3d at 161)).

[88] The concurrence references *United States v. Hussain*, 835 F.3d 307 (2d Cir. 2016), and states that "nothing in today's majority opinion calls into question [its] vitality." Concurring Op. at 1. We indeed offer no view, as an *en banc* Court, as to the correctness *vel non* of the panel decision in *Hussain*, which considered a particular combination of facts. But we do not agree with the concurrence that, but

61

conclude that the pat-frisk was justified under the Fourth Amendment.

## III. CONCLUSION

We conclude with two final observations.

First, the district court—whose decision we affirm in full—did not rely in any way on Weaver's race in determining that the officers had reasonable suspicion to search him for weapons. In fact, the district court's decision did not even mention Weaver's race. Nor, of course, do we. Although two of the dissents open their recitation of

---

for two facts present in today's case, "this appeal would resemble *Hussain*." Concurring Op. at 3. The concurrence may believe that each of the other factors we have relied upon "do not support the conclusion that the officers had reasonable suspicion that Weaver was armed and dangerous." *Id.* at 4 n.2. But the *en banc* majority holds to the contrary. We do, however, agree with the concurrence that a salient distinction between *Hussain* and the present case is that, in *Hussain*, the officers saw the defendant move his hand but were then reportedly able to see clearly that the defendant was holding only a phone, and not a weapon, *see Hussain*, 835 F.3d at 315; here, the officers could not see what Weaver was pushing in his pants. *See also Paulino*, 850 F.2d at 94–95 (upholding protective car search for weapons where officers saw defendant bending over in rear seat, as if placing something unseen on the floor).

the facts of this case by noting Weaver's race,[89] we do not understand them to suggest that the Court's Fourth Amendment analysis in this case has been improperly influenced by that factor.

Second, the concurrence argues, in part, that courts should be able to look at an officer's subjective intentions for a traffic stop in "clear cases of racial bias," and provides as an example an officer who "pull[s] over a car for driving one mile-per-hour faster than the speed limit and then explicitly announce[s] that he had stopped the driver because the driver was African American."[90] Notably, the concurrence does not assert that any evidence of racial bias exists in this case, nor did Weaver raise such an argument in the court below, on initial appeal, or before our *en banc* Court. Thus, even if this exception to *Whren's* "important and correct general rule" were to exist,[91] there is

---

[89] Pooler Dissenting Op. at 1; Chin Dissenting Op. at 1.

[90] Concurring Op. at 15, 16.

[91] *Id.* at 16.

simply no grounds for believing that it would have any bearing on the outcome of this case. Nor does the concurrence assert otherwise.

\* \* \*

To summarize, we hold that:

(1) A police officer's verbal directives do not transform a stop into a search where they do not constitute a physical trespass on a constitutionally protected area or an intrusion into an area subject to a reasonable expectation of privacy. Officer Tom's order for Weaver to stand against the car was neither. Here, the frisk did not begin until Officer Tom began physically patting down Weaver's clothing, irrespective of any reasonable belief by Weaver as to when the search began;

(2) A police officer's subjective intent bears no weight in determining when a search occurs. Whether Officer Tom intended to search Weaver when he ordered him out of the

64

car is irrelevant to when the frisk began and whether he had an objective basis for the frisk; and

(3) In evaluating whether an officer has reasonable suspicion that a lawfully detained suspect is armed and dangerous, courts must look to the totality of the circumstances confronting the police officer, as viewed objectively by a reasonable and cautious officer on the scene. When the circumstances give rise to reasonable suspicion that a suspect has a weapon, an officer need not rule out alternative explanations—whether innocent or otherwise—for a suspect's behavior before deciding to conduct a pat-down for his safety. Based on the totality of the circumstances here, Officer Tom's frisk of Weaver was supported by objective and particularized facts sufficient to give rise to a reasonable suspicion that Weaver was armed and dangerous.

For the foregoing reasons, we **VACATE** the panel decision and

**AFFIRM** the judgment of the district court.

RAYMOND J. LOHIER, JR., *Circuit Judge*, concurring in the result, joined by SUSAN L. CARNEY, *Circuit Judge*, except as to Part III.B:

I disagree with much of the majority's needlessly broad opinion and decline to join it, even though precedent compels me to concur in the ultimate result. In my view, the police officer reasonably suspected that Weaver was armed and dangerous only after, as the District Court found, Weaver behaved abnormally and without explanation while seated in and standing next to the stopped car, appeared to go to great lengths to conceal something large around his pelvic area, and then lied to explain why he was unable to step away from the car when instructed to do so. And although in some limited circumstances an officer can effectuate a search merely by making a verbal command, that is not what happened here. In this case, the search began when the police officer physically touched Weaver, not when he told him to spread-eagle. No other facts, factors, or law are necessary to the result in this case.

I also write separately to address three central issues of grave concern. First, nothing in today's majority opinion calls into question the vitality of our decision in United States v. Hussain, 835 F.3d 307 (2d Cir. 2016). Second, a defendant's presence in a so-called "high-crime area" has limited relevance in

1

determining the reasonableness of a search; indeed, the whole concept of a "high-crime area" is now so ill-defined as to be virtually meaningless. Third, it is time for the Supreme Court to veer away from existing law and to revisit decisions that have provided unjustifiable cover for racial bias in policing; and regardless, legislatures and administrative bodies should consider adopting regulations that increase police accountability beyond the bare constitutional minimum provided by the Fourth Amendment.

I.

First, Hussain. In that case, the defendant ran a stop sign and was pulled over by the police. Officers observed the defendant's right arm move toward the middle console area of the car, but as the officers approached the vehicle, they quickly determined that the defendant had reached into the console to retrieve a smartphone. The officers also testified that the front passenger sat in an "unnatural" position—too close to the middle console—"as if covering something up." Further, the defendant did not immediately comply with the officer's instruction to put down his phone. Of note, that defendant was an African-American man driving through a so-called "high-crime area" in the Bronx. Id. at 310–11, 315–16. The defendant was ordered out of the car,

2

prompting his disclosure that he (legally) possessed a pocket-knife. Id. at 311. Reversing the district court, we held that the officers' subsequent search of the defendant's car and discovery of a loaded gun under the front passenger seat was unconstitutional because the officers did not have a reasonable suspicion that the defendant posed an immediate danger. Id. at 311, 314, 317.

Several facts distinguish this case from Hussain, but let me focus on two. First, in Hussain the officers became aware that the defendant's purportedly suspicious arm movements merely involved the retrieval of a smartphone. But here Weaver's "suspicious movements concentrated around his waist and pelvis," Majority Op. at 46, remained entirely unexplained through the inception of the search. See Hussain, 835 F.3d at 315 (distinguishing a case in which the officers were unable to see what the obscured object was). And second, the District Court here credited Officer Tom's testimony that Weaver falsely claimed he could not step back from the car because the ground was "slippery." App'x 163.[1] Without these two facts, this appeal would resemble Hussain, and I

---

[1] Weaver stated that he could not step back from the car only after Officer Tom ordered Weaver to get out of the car and stand with his hands on the trunk and his feet spread apart. I agree with the majority that, while "in certain circumstances, a police officer might effectuate a search through a verbal command, without physically touching a person," Officer Tom's order here "did not constitute a search." Majority Op. at 35 &

3

would conclude that the officers did not have reasonable suspicion to justify the frisk at issue here.[2]

There is no question after today's decision that <u>Hussain</u> remains the law of this Circuit. In <u>Hussain</u> we explained:

> Part of our trouble is that stops fitting the same fact pattern (but, say, different passengers of another race, gender, or ethnicity) would, we think, rarely if ever lead the police to suspect the passengers posed an immediate danger and justify a protective search of the passenger compartment. Put another way, allowing a protective search on these bare facts would sweep too broadly. Whatever extra fact prompted [the officers] to harbor a suspicion of dangerousness . . . was left unsaid on the record before us.

---

n.52. Rather, the search did not begin until Officer Tom made physical contact with Weaver. Of course, that does not foreclose the possibility that an order to assume a "spread-eagle" position on a car may be an additional seizure beyond an initial traffic stop, requiring suspicion beyond the initial justification for the stop. But this argument is not properly presented to us on appeal because Weaver failed to raise it before the District Court.

[2] By contrast, other factors cited by the majority do not support the conclusion that the officers had reasonable suspicion that Weaver was armed and dangerous. For example, I agree with my dissenting colleague that it would be "absurd" to conclude that looking for a few seconds at an unmarked car with tinted windows "allows a reasonable inference that the person looking is engaged in criminal activity." Dissenting Op. (Pooler, <u>J.</u>) at 15; <u>see</u> <u>infra</u> Part II (addressing the "high-crime area" factor). A car with tinted windows idling on a leafy suburban street is just as likely to draw the quizzical attention of an innocent bystander. As Judge Pooler explains, it would be odd <u>not</u> to look at it and wonder who was inside. I also agree with Judge Calabresi that the majority's description of how (and how long) Weaver looked at the unmarked car in this case is not at all supported by the record. Dissenting Op. (Calabresi, <u>J.</u>) at 6 n.2.

835 F.3d at 315.  Hussain thus suggests a simple but important analysis that district courts should undertake when faced with similar Fourth Amendment challenges.  A court should ask, holding all else equal:  "Would an officer have reasonable suspicion if the defendant were of a different race?"  If the answer is "no," the fact that the defendant is, say, African American does not tip the balance of the totality of the circumstances.  Bias, explicit or implicit, is an unreasonable basis for suspicion.

II.

That brings me to my second point.  Police officers and the Government routinely assert that the challenged search was reasonable because it occurred in a high-crime area.  But what is a "high-crime area"?  It has been more than twenty years since the Supreme Court explained that presence in a "high crime area" is "relevant" when determining whether the defendant was constitutionally stopped.  Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (quotation marks omitted).  But because basic questions remain unresolved, I doubt that a person's presence in a "high-crime area" should ever meaningfully support reasonable suspicion.  For example, how big can the area be?  A building, corner, block, neighborhood, or precinct?  Should courts train their attention on the

overall crime rate in the area, or are only some kinds of crime relevant? Should they consider the crime rate over the last five years? One year? Less?

Rather than address these questions, courts often defer to the experience of testifying police officers. See Ben Grunwald & Jeffrey Fagan, The End of Intuition-Based High-Crime Areas, 107 Calif. L. Rev. 345, 347–48 (2019); Andrew G. Ferguson & Damien Bernache, The "High Crime Area" Question: Requiring Quantifiable Evidence for Fourth Amendment Reasonable Suspicion Analysis, 57 Am. U. L. Rev. 1587, 1607 (2008). In this case, for example, the majority concludes that the entire Near Westside of Syracuse is a "high-crime neighborhood" based only on the arresting officers' vague and anecdotal testimony. Majority Op. at 57–58; see, e.g., App'x 93 (the neighborhood is "dangerous" and has a "high volume" of gun-related crimes); App'x 150 (Officer Tom processed "multiple" homicides in the neighborhood during his six years in the department). Blind acceptance of police testimony on this issue creates an unjustified risk of arbitrary and discriminatory policing. See United States v. Caruthers, 458 F.3d 459, 467–68 (6th Cir. 2006); United States v. Montero-Camargo, 208 F.3d 1122, 1138 (9th Cir. 2000).

This risk is real.  Consider data collected by the New York City Police Department (NYPD), perhaps the most data-driven police department in the country.  In the aftermath of extensive litigation, the NYPD required its officers to record their justifications for every stop.  See Grunwald & Fagan, The End of Intuition-Based High-Crime Areas, supra, at 350 & n.12.  An analysis of data collected between 2007 and 2012 yielded startling results:  Actual crime rates were almost unrelated to whether an officer characterized the area as "high-crime," regardless of the geographic scope, timeframe, and types of crime considered.  See id. at 384.  The race, gender, and age of the suspect had a slightly greater impact on how officers perceived the area, see id. at 387, but the biggest contributors were the neighborhood's racial composition, see id. at 389–90,[3] and

_____

[3] Because officers are more likely to perceive majority-minority neighborhoods as "high-crime areas," African Americans are viewed suspiciously wherever they go.  Majority-minority neighborhoods become "high-crime" neighborhoods, and otherwise innocent conduct appears to some as suspicious.  See, e.g., supra, note 2; United States v. Flowers, — F.4th —, 2021 WL 3234279, at *1–2 (5th Cir. July 30, 2021) (six or seven police officers in separate vehicles with lights on swarmed two people because they sat in their car for ten to fifteen seconds while parked outside a convenience store at 8:30 p.m.).  Meanwhile, African Americans who simply walk or drive in an affluent (or white) neighborhood risk rousing an officer's suspicions because of the color of their skin.  See, e.g., Oliveira v. Mayer, 23 F.3d 642, 644 (2d Cir. 1994) (police officers in six vehicles responded with guns drawn to a private citizen's report that "there may have been a burglary" because he saw "three dark-skinned males[] handling an expensive video camera while driving in a dilapidated station wagon through an affluent area"); Tanzina Vega, For Affluent Blacks, Wealth Doesn't Stop Racial Profiling, CNN (July 14,

7

the officer who made the stop, see id. at 393 ("Taken together, these empirical results provide evidence of wide inter-officer disparities in the assessment of whether an area qualifies as high crime.").  To top it off, officers were less likely to make an arrest, recover weapons, or find contraband when they stopped a suspect in a purportedly high-crime area.  See id. at 394–96.  The bottom line is that an officer's belief that the area was "high-crime" was unrelated to both actual crime rates and the likelihood that criminal activity was afoot.

Embracing a few basic principles would improve matters and avoid this intolerable result.

First, officers may reasonably believe that an area has a high crime rate only if supported by data.  Courts should neither rely on officers' "war stories," Montero-Camargo, 208 F.3d at 1143 (Kozinski, J., concurring), nor take their views at face value, see United States v. Freeman, 735 F.3d 92, 101–02 (2d Cir. 2013) ("[T]he general label 'high crime area' is not a substitute for analysis of the underlying testimony.").  In suggesting that it is "logical" for courts to rely on that kind of evidence, Majority Op. at 60 n.86, today's majority ignores important

2016), https://money.cnn.com/2016/07/14/news/economy/wealthy-blacks-racial-profiling/index.html.  It is a no-win situation for those with darker skin—they face a higher risk of getting stopped nearly anywhere and everywhere they go.

data and decies of judicial experience showing that police officers do not reliably identify crime rates. See Grunwald & Fagan, The End of Intuition-Based High-Crime Areas, supra, at 350–51 (only "one percent of the variation in officers' assessments of whether areas are high crime" is explained by "actual crime rates").[4] Relying on demonstrably weak, possibly biased, and arbitrary evidence is, put simply, indefensible and unnecessary: Law enforcement agencies are now fully capable of logging and mapping the locations of actual criminal conduct. See Ferguson & Bernache, The "High Crime Area" Question, supra, at 1627–28 & nn.251–52 (collecting jurisdictions that make "high-quality mapping technologies" publicly available); see also City of Syracuse, Police Reform and Reinvention Plan 19 (Mar. 2021) (the Syracuse Police Department "utilizes spatial density hot spot statistics to map priority street segments, creating a perimeter around the most severe hot spots, creating [Problem-Oriented Policing] areas based on its measured data").

---

[4] As long as statistical evidence is "not required," the majority's consolation that it "may likewise be offered" is really no consolation at all. Majority Op. 60 n.86. Many police departments do not make crime data publicly available, and few publish data about specific neighborhoods, let alone areas specific enough to be of use. At a hearing or trial, the Government may have access to better statistical evidence, but it will rarely if ever have any reason to introduce it if the officer's testimony will do. That leaves defendants with no meaningful way to test the representations of police officers about the crime rate in a specific area.

Second, courts should give little if any weight to the suspect's presence in a "high-crime area" unless the area's boundaries are narrowly circumscribed. As often as not, it is far-fetched and unfair to paint an entire neighborhood as crime-ridden. Even the most dangerous neighborhoods are also home to law-abiding citizens, see People v. Bower, 597 P.2d 115, 119 (Cal. 1979) ("The spectrum of legitimate human behavior occurs every day in so-called high crime areas."), and crime is unlikely to be distributed evenly within a neighborhood. The very nature and boundaries of a "neighborhood" are often hard to define, arbitrary, and in any event prone to variations in crime rates from one part to the next. Reserving the "high-crime" label for very specific locations, like an intersection where illegal deals are made, would more accurately identify suspicious behavior and better respect the liberty of people "go[ing] about their daily business." Montero-Camargo, 208 F.3d at 1138; see also United States v. Wright, 485 F.3d 45, 54 (1st Cir. 2007); Caruthers, 458 F.3d at 468.

Third, police officers and courts should focus on recent and relevant criminal activity. See Wright, 485 F.3d at 53–54. Because crime patterns can change quickly, the crime rate in the last few weeks matters far more than the rate in the last few years. And "unless there is some identity between the

10

prevalent crime and the crime suspected," an individual's presence in a high-crime area does not make their conduct more suspicious. Sheri Lynn Johnson, Race and the Decision to Detain a Suspect, 93 Yale L.J. 214, 222 n.42 (1983); see also Caruthers, 458 F.3d at 468 (noting that "the crimes that frequently occur in the area are specific and related to the reason for which [the defendant] was stopped"); United States v. Edmonds, 240 F.3d 55, 60 (D.C. Cir. 2001) (similar). When an officer sees someone carrying a can of spray paint in a high-crime area, it matters whether the crime prevalent in the area is vandalism or pickpocketing.

The three principles described above derive from the Fourth Amendment's requirement that searches be reasonable. Together with other factors, they require what we should have demanded long ago: that courts carefully examine whether a suspect's location increases the probability that he is engaged in criminal activity or carrying a weapon. Otherwise, our law will "come[] dangerously close to declaring that persons in 'bad parts of town' enjoy second-class status in regard to the Fourth Amendment." United States v. Rideau, 969 F.2d 1572, 1577 (5th Cir. 1992) (en banc) (Smith, J., dissenting); see United States v. Flowers, — F.4th —, 2021 WL 3234279, at *8 (5th Cir. July 30, 2021) (Elrod, J.,

dissenting) ("We must ensure that Americans living in disadvantaged or high crime communities still have Fourth Amendment protections.").

## III.

Hussain and these narrow and well-defined parameters of a "high-crime area" are necessary baby steps that fall well within the confines of existing law and at the same time substantially reduce the possibility of racial and other impermissible biases seeping into federal criminal proceedings. Even more needs to be done, however, to reestablish trust between law enforcement officers and the communities they police. I highlight two proposed changes here: reconsidering the Supreme Court's decision in Whren v. United States, 517 U.S. 806 (1996), and regulating police departments and police officers.

## A.

I am bound by precedent and for that reason alone concur in the result of the majority's decision. But I agree with my dissenting colleagues that Whren should be revisited. In Whren, the Court held that the "actual motivations" and "[s]ubjective intentions" of individual officers "play no role" in assessing the "constitutional reasonableness of traffic stops." Even the "intentionally discriminatory application of laws"—e.g., selective enforcement of traffic laws

12

"based on considerations such as race"—would not amount to an unreasonable search or seizure in violation of the Fourth Amendment. Id. at 813.

As a practical matter, Whren and later cases[5] have unfortunately given police officers a green light to make pretextual stops based on racial profiling. See, e.g., Stephen Rushin & Griffin Edwards, An Empirical Assessment of Pretextual Stops and Racial Profiling, 73 Stan. L. Rev. 637 (2021); Gabriel J. Chin & Charles J. Vernon, Reasonable but Unconstitutional: Racial Profiling and the Radical Objectivity of Whren v. United States, 83 Geo. Wash. L. Rev. 882, 884 & n.2, 885–86 (2015).[6] Although a criminal defendant victimized by a racially biased pretextual stop can claim a violation of the Equal Protection Clause in a separate civil proceeding, any evidence obtained as a result of the racially biased stop could still be used against him in his criminal proceeding. See Whren, 517 U.S. at 813; see also, e.g., Pamela S. Karlan, Race, Rights, and Remedies in

---

[5] See, e.g., Ashcroft v. al-Kidd, 563 U.S. 731, 739 (2011) ("Our unanimous opinion [in Whren] held that we would not look behind an objectively reasonable traffic stop to determine whether racial profiling or a desire to investigate other potential crimes was the real motive.").

[6] See also, e.g., Anthony C. Thompson, Stopping the Usual Suspects: Race and the Fourth Amendment, 74 N.Y.U. L. Rev. 956, 981–98 (1999); Andrew D. Leipold, Objective Tests and Subjective Bias: Some Problems of Discriminatory Intent in the Criminal Law, 73 Chi.-Kent L. Rev. 559, 568 (1998) ("Although Whren was nominally about the contours of the Fourth Amendment, the decision undeniably makes it easier for the police to engage in race-based behavior.").

Criminal Adjudication, 96 Mich. L. Rev. 2001, 2010–14 (1998) (explaining why "[w]e should . . . be troubled if the major effect of the move from regulating the police under the Fourth Amendment to regulating them under the Equal Protection Clause is to exclude the exclusionary rule as a remedial strategy"); Chin & Vernon, Reasonable but Unconstitutional, supra, at 918 (criticizing Whren's "attempt[] to divorce from the Fourth Amendment the decision to stop or arrest based on race," and arguing that "a search, seizure, or interrogation based on a prior violation of the Due Process or Equal Protection Clauses should be regarded as fruit of the poisonous tree").

As the majority notes, "this is a case about searches, not seizures." Majority Op. at 35. Even if Weaver had challenged the officers' initial decision to pull over his car, his challenge in the criminal proceeding before us would have been foreclosed by Whren. But why, exactly, did this particular turn-signal violation catch the attention of the Syracuse Police Department? See generally Peter Shakow, Let He Who Never Has Turned Without Signaling Cast the First Stone: An Analysis of Whren v. United States, 24 Am. J. Crim. L. 627, 633 (1997).

In today's world, "[t]he apparent assumption of the Court in Whren, that no significant problem of police arbitrariness can exist as to actions taken with

14

probable cause, blinks at reality." 1 W. LaFave, <u>Search and Seizure</u> § 1.4(f), at 195 (6th ed. 2020). Say a police officer pulled over a car for driving one mile-per-hour faster than the speed limit and then explicitly announced that he had stopped the driver because the driver was African American. And say that this particular racially motivated stop happened to lead to evidence of a federal drug crime. If criminal charges were later filed against the driver based on evidence obtained during the stop, <u>Whren</u> would prevent the driver from raising the officer's explicit racial bias in any attempt to suppress the evidence. <u>Whren</u> instructs that the driver has no recourse as far as his liberty is concerned, but that later on he may be able to sue for damages.

That cannot be the correct constitutional outcome in a multiracial democracy. Criminal defendants must be able to raise the issue of selective enforcement where the presence of racial bias is unmistakable, and they should not have to do so in a separate civil proceeding. A separate proceeding creates at least two distinct disadvantages for the subject of a racially biased stop. First, as noted, he may be convicted of a crime with evidence obtained during the constitutionally infirm stop. Second, a number of civil doctrines (for example, as Judge Calabresi points out in dissent, qualified immunity) limit or foreclose the

15

likelihood the criminal defendant will have <u>any</u> remedy for the violation of his right to equal protection of the laws. <u>See</u> Dissenting Op. (Calabresi, <u>J.</u>) at 9–10 & n.4.

While <u>Whren</u> states an important and correct general rule that removes an officer's subjective intentions from Fourth Amendment scrutiny (and the reach of the exclusionary rule), there must be an exception for clear cases of racial bias. Racial discrimination in the criminal justice system impugns the integrity of our judicial proceedings and "undermine[s] public confidence in the fairness of our system of justice." <u>Batson v. Kentucky</u>, 476 U.S. 79, 87 (1986) (prohibiting the use of race as a factor in exercising peremptory challenges); <u>see</u> <u>also</u> Tracey Meares, <u>The Legitimacy of Police Among Young African-American Men</u>, 92 Marq. L. Rev. 651, 656–60 (2009) (asserting, based on empirical studies, that "legitimacy is typically more important to [an individual's] compliance" with the law than the threat of sanctions for failure to comply). There are those who think any departure from <u>Whren</u> would be judicially unadministrable and transform every criminal case into an equal protection lawsuit. But the sky has not fallen in States that have long declined to follow <u>Whren</u>. <u>See, e.g.,</u> <u>Commonwealth v. Long</u>, 485 Mass. 711, 712 (2020) (holding that a trial court judge "abused his discretion in

16

denying [a] motion to suppress, because the defendant produced sufficient evidence to raise a reasonable inference that the stop was racially motivated" and creating a new burden-shifting test for suppression of evidence based on violations of equal protection principles because a previous case "set the bar too high for defendants"); Margaret M. Lawton, State Responses to the *Whren* Decision, 66 Case W. Rsrv. L. Rev. 1039 (2016) (discussing state law departures from Whren); cf. United States v. Braggs, — F.4th —, 2021 WL 2931403, at *4 n.5 (2d Cir. July 13, 2021) (noting that the Supreme Court has, in other contexts, endorsed Fourth Amendment challenges based on "the actual motivations of individual officers" to prevent "arbitrary, capricious or harassing" searches (quotation marks omitted)).

Judge Carney and I therefore join the chorus of voices who say that Whren "sets the balance too heavily in favor of police unaccountability to the detriment of Fourth Amendment protection." District of Columbia v. Wesby, 138 S. Ct. 577, 594 (2018) (Ginsburg, J., concurring in part); see also Dissenting Op. (Calabresi, J.) at 11–12, 22–24; Dissenting Op. (Pooler, J.) at 24–29; Dissenting Op. (Chin, J.) at 5. Allowing the fruit of a stop tainted by racial bias to be admitted at a trial or hearing undermines the integrity of judicial proceedings, imperils trust in the

17

justice system, and decreases public safety. Residents of affected communities, especially young people targeted by law enforcement, are "less likely to cooperate with the police, even when they are in danger or have been the victim of crime."[7] Whren should be reconsidered.

B.

It bears emphasizing that the Fourth Amendment "establishes the minimum constitutional standards and procedures" for searches and seizures. Manuel v. City of Joliet, — U.S. —, 137 S. Ct. 911, 917 (2017) (emphasis added) (quotation marks omitted). It does not prevent Congress, or state and local governments, from setting more demanding standards or providing additional remedies to those harmed by police misconduct. Regulation of policing deserves legislative attention when the constitutional floor in relation to racially biased policing remains unconscionably low.

Police encounters are among the most common forms of interaction between private citizens and the government. Police officers tackle a wide range of problems, from the mundane to the life-altering, from directing traffic when a stoplight malfunctions to responding when the victim of a serious crime calls 911.

---

[7] Jennifer Fratello, et al., Coming of Age with Stop and Frisk: Experiences, Perceptions, and Public Safety Implications 6, Vera Institute of Justice (Sept. 2013).

They also wield real power—to search homes, throw citizens in jail, and even kill. Despite their power and the frequency of their interactions with citizens, however, officers and the departments that employ them are not highly regulated by democratic institutions. Most policing agencies are broadly authorized by statute "to enforce the substantive criminal law," without significant restrictions or guidance on how to do so. Barry Friedman & Maria Ponomarenko, Democratic Policing, 90 N.Y.U. L. Rev. 1827, 1844 (2015). As a result, most places have little more than a "latticework" of legislation governing only "particular aspects of policing," such as wiretaps. Id. Meanwhile, the internal policies of many police agencies are hidden from public view and are rarely if ever binding. See id. at 1848–49; see also Syracuse Police Department, http://www.syracusepolice.org (last visited July 16, 2021) (disclosing only the policies governing body cameras, interactions with transgender individuals, and use of force). The Fourth Amendment has thus become the primary legal constraint on police power.

It is time to regulate police departments and the officers they employ. Substantive regulation of the police has several advantages and benefits beyond giving full effect to the Fourth Amendment's protections. Among other things,

regulations can enhance police accountability in a way that current Fourth Amendment doctrine does not.  See Friedman & Ponomarenko, <u>Democratic Policing</u>, <u>supra</u>, at 1865.  And unlike current Fourth Amendment doctrine— which generally allows law enforcement to act first and assess the lawfulness of their actions only if challenged in later litigation—regulations provide police departments and officers clear guidance well in advance of any police conduct or litigation.  <u>Id.</u>  More broadly, giving communities and their elected representatives greater input on police activities, including searches, promotes police legitimacy and trust.  For these reasons (and others), communities are beginning to assert more control over the police departments that serve them.  <u>See</u> K. Sabeel Rahman & Jocelyn Simonson, <u>The Institutional Design of Community Control</u>, 108 Calif. L. Rev. 679, 699–711 (2020) (explaining that in recent years, there has been a "resurgence in the demand for community control" over policing).  Today's majority decision does nothing to counter or cast doubt on these helpful developments.

IV.

Current Fourth Amendment precedent forces me, reluctantly, to agree that certain particular facts and the limited circumstances presented in this case

20

provided reasonable suspicion that justified the challenged frisk. For those reasons, and those reasons alone, I would affirm the judgment of the District Court.

ROSEMARY S. POOLER, *Circuit Judge*, dissenting, joined by GUIDO CALABRESI and

DENNY CHIN, *Circuit Judges*:

On February 15, 2016, Calvin Weaver, a black man in a hooded sweatshirt,

walked along a street, peacefully minding his business, when three police

officers in an unmarked car set their sights on him. The officers, Detective

Gordon Quonce, Detective Greg Staub, and Officer Jason Tom, were patrolling

the neighborhood as members of the Syracuse Police Department's Gang

Violence Task Force. They drove past Weaver, who looked at their car for "a few

seconds" until they drove away. App'x at 174. The officers saw Weaver use one

hand to tug his pants up because "his pants were lower than waist level" and get

in a car. App'x at 152. Shortly after, they pulled the car over at a corner that only

permits right turns because its driver failed to signal a right turn 100 feet before

turning, in violation of New York's Vehicle and Traffic Laws.

When the car stopped, the rear passenger, a black male, opened his door.

Tom immediately got out of the unmarked car and "gave forceful commands"

that the passenger stay in the car. App'x at 156. Quonce asked the rear passenger

to shut the door, and the rear passenger did as he was told. As Tom approached

the car, he saw Weaver seated in the front passenger seat with "both hands kind

of pushing down on his pelvic area and squirming kinda in the seat left and right, shifting his hips." App'x at 158. He ordered Weaver to show his hands and Weaver complied, telling Tom "I don't got nothin'." App'x at 159. Tom opened the door and ordered Weaver to put his hands on his head. Weaver complied. Tom asked Weaver if he had identification. Weaver responded that his identification was in his right pocket. Because Tom did not notice "any bulges or anything," he ordered Weaver to retrieve the identification. App'x at 160. Weaver complied. Tom then placed Weaver's identification in his own pocket. Despite Weaver's consistent compliance, the situation escalated.

With one hand on his holstered firearm, Tom ordered Weaver to exit the car, move to the back of the car, "place his hands on the trunk" of the car, and "spread" his legs. App'x at 161. Weaver complied. Tom ordered Weaver to take a step back, and Weaver again complied. At this point, Tom "began to pat [Weaver's] waistband area." App'x at 162. Weaver's walk in the neighborhood ultimately ended with officers handcuffing him, reaching their hands into his pocket, unzipping his pants, unbuttoning his underwear, reaching inside his underwear, and pulling out a gun.

2

Weaver was initially charged with criminal possession of a weapon in the second degree in violation of Section 265.03(3) of New York Penal Law. The state court granted Weaver's motion to suppress evidence of the gun, reasoning that the officers lacked reasonable suspicion to frisk Weaver. The federal government then charged Weaver with possession of a weapon and possession of a controlled substance in violation of 18 U.S.C. § 922(g)(1), (k) and 21 U.S.C. § 844(a). Weaver moved to suppress the evidence in his federal case. Unlike the state court, the district court denied Weaver's motion.

On appeal, the principal issues are whether Tom began a search when he ordered Weaver to put his hands against the car and spread his legs and whether Tom had reasonable suspicion to believe that Weaver was armed and dangerous either at that time or when he first touched Weaver. The original panel correctly concluded that the search began the moment that Tom ordered Weaver to assume an "in-search" position and that Tom lacked reasonable suspicion that Weaver was armed and dangerous at that time.

In a practice becoming all too familiar in this Court, the en banc Court reaches a panoply of legally unsupportable holdings that unnecessarily expand protections for officers at the expense of the people's Fourth Amendment right to

3

be free from unreasonable searches and seizures. Among them, it agrees with the district court that the search did not begin until Tom first touched Weaver and that Tom reasonably suspected Weaver to be armed and dangerous at that time.

The majority's decision is contrary to the Fourth Amendment's clear prohibition against unreasonable searches and seizures. It is also contrary to the decision of the state court, which, after conducting an evidentiary hearing, granted Weaver's motion to suppress. The state court concluded that Weaver's actions "were at all times innocuous and readily susceptible of an innocent interpretation" and that "there was no evidence adduced to show that the officers reasonably suspected that they were in danger of physical injury." App'x at 26. In concluding otherwise, the majority expands Fourth Amendment doctrine to hold that officers need not rule out alternative explanations for conduct before frisking a person not yet suspected of having committed a crime. For these reasons, I respectfully dissent.

## I.    Tom Lacked Reasonable Suspicion to Frisk Weaver.

The majority holds that the facts and reasonable inferences to be drawn from those facts establish that Tom's frisk was supported by objective and particularized facts giving rise to reasonable suspicion that Weaver was armed and dangerous. That is incorrect. Even if the search only began when Tom

4

physically touched Weaver, a conclusion I disagree with and address in Section II—Tom lacked reasonable suspicion that Weaver was armed and dangerous at that time. Weaver's innocuous behaviors did not provide reasonable suspicion justifying Tom's actions.

Law enforcement authority to search for weapons absent probable cause is not limitless. That authority is "narrowly drawn" and must be based on an "articulable and objectively reasonable belief" that a person is "armed and presently dangerous to the officers or others." *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *Michigan v. Long*, 463 U.S. 1032, 1047, 1051 (1983) (internal quotation marks omitted). A stop and frisk is only "constitutionally permissible" if "the investigatory stop [is] lawful" and the officer "reasonably suspect[s] that the person stopped is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009).

The "concept of reasonable suspicion is somewhat abstract." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). Reasonable suspicion must be supported by "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Long*, 463

5

U.S. at 1049 (internal quotation marks omitted). An officer's "mere hunch does not create reasonable suspicion," but the standard requires "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Kansas v. Glover*, 140 S. Ct. 1183, 1187, 206 L.Ed.2d 412 (2020) (internal quotation marks omitted). To adequately draw the line between mere hunches and proof of wrongdoing by a preponderance of the evidence, the inferences we draw from facts must be reasonable. To ensure that the inferences we draw from facts are reasonable, we must consider whether behaviors are innocuous in the eyes of a "reasonably prudent man in the circumstances." *Terry*, 329 U.S. at 27.

The majority starts its reasonable suspicion analysis by emphasizing that Tom saw Weaver make movements near his waist three times before Tom touched Weaver. In its reasoning, the majority draws unreasonable inferences from the facts.

The first movement occurred when Tom, standing roughly two car lengths away from Weaver, observed Weaver tug his pants up with one hand prior to getting into a car. Tom testified that Weaver's "pants were lower than waist level and it was kind of a tugging upward, like adjusting" motion. App'x at 152. The

6

majority states that it takes no specialized expertise to reasonably infer that an "'upward tug' may be needed to counteract the downward pull of something else" such as a "firearm," Maj. Op. at 49, but that is not a reasonable inference that can be drawn from the facts. Tom did not testify to making this inference, and for good reason. Weaver tugged his pants up with one hand, not two. Importantly, cases relying on suspicious inferences concerning the waistline also involve officer observations of a bulge or adjustment of an object near the waistline, and not the relatively commonplace act of pulling pants up because they are "lower than waist level." App'x at 152. Our decision in *United States v. Padilla* succinctly illustrates the issues with the majority's inference drawing. 548 F.3d 179 (2d Cir. 2008).

In *Padilla*, an officer testified that during a traffic stop, he "observed Padilla reach underneath his jacket and shirt, adjust something in the center of his waistband, and continue walking." *Id.* at 183. The officer testified that he "knew that firearms commonly are concealed in the waistband and that, when they are, they require readjustment because they shift and become uncomfortable." *Id.* We affirmed the district court's denial of Padilla's motion to suppress a handgun recovered after a stop and frisk. Our Court noted that though the officer

7

"realized at the time that Padilla could have been adjusting something other than a firearm, he did not recognize the gesture as being consistent with any innocent explanation" and testified that the movement "was not consistent with" Padilla "pulling up [his] pants." *Id.* at 183 & n.2. *Id.* We reasoned that "[e]ven if the gesture were consistent with conceivable innocuous adjustments, its 'distinctive' consistency with the adjustment of a firearm provided the detective with a reasonable basis to suspect that Padilla was armed." *Id.* at 189.

Unlike in *Padilla*, Tom's own testimony establishes that he realized that Weaver's tugging upward of his pants was consistent with an innocent explanation. Tom testified that Weaver's "pants were lower than waist level and it was kind of a tugging upward, like adjusting." App'x at 152. There is simply no evidence in the record that Tom witnessed Weaver adjust his pants in a "distinctive" manner that would indicate that Weaver possessed a weapon. Nothing but Tom's and the majority's "inchoate and unparticularized suspicion[s] or hunch[es]," *Padilla*, 548 F.3d at 187 (internal quotation marks omitted), support the inference that Weaver had a weapon simply because he pulled up his sagging pants with one hand.

8

The second movement occurred during the traffic stop. When Tom was "approaching the vehicle," he observed Weaver "slouched down pushing down his pelvic area and kind of squirming in his seat" and "shifting his hips." App'x at 158. Tom testified that he could see Weaver's "pelvic area, his lower part of his body," and importantly, "his hands." *Id.* Weaver was moving "both hands" in a "[d]ownward motion, trying to push something down." App'x at 158-59. The majority infers that Weaver must have been moving an object large enough to need that much effort to shift around. Tom did not testify as to how long or how many times Weaver engaged in this motion. To conclude that Weaver must have been moving a large object because of the amount of "effort" involved in the motion, Maj. Op. at 49, when there is no testimony establishing how long the motion lasted or how many times Weaver engaged in the motion, is unreasonable.

Simply put, there are no specific and articulable facts supporting Tom's belief that any object that Weaver was moving was dangerous. Tom did not observe any bulges or outline of a weapon on Weaver's person at any point throughout the encounter. And Weaver did not reach underneath his clothing, as Padilla did, to adjust anything. *See Padilla*, 548 F.3d at 189. The difference

9

between adjusting a firearm and adjusting any other object matters because the officer must have reasonable suspicion that the object is dangerous. *See United States v. Hussain*, 835 F.3d 307, 313 (2d Cir. 2016) (stressing *Long*'s requirement of present dangerousness, reasoning that the dangerousness requirement "is based on the premise set forth in *Terry* that [a] search must be genuinely protective" and not have a "purely evidentiary" purpose).

After observing these movements, Tom gave multiple commands to Weaver, and Weaver complied with them all. Tom asked Weaver to show his hands. Weaver complied. He put his hands up and volunteered, "I don't got nothin'." App'x at 159. Tom asked Weaver to put his hands on his head. Weaver complied. Tom asked Weaver for identification. Weaver complied, responding that his identification was in his right pocket. Tom noticed no "bulges or anything" and ordered Weaver to "slowly use his right hand to remove his ID from his pocket." App'x at 160. Weaver complied. Tom placed Weaver's ID in his own pocket. Tom then ordered Weaver to exit the vehicle. Weaver complied. Tom ordered Weaver to move towards "the rear quarter panel trunk area" of the car. App'x at 161. Weaver complied. At this point, Tom had one hand on his holstered firearm. Tom ordered Weaver to "place his hands on the trunk" of the

10

car and "spread" his legs open. App'x at 161. Weaver complied. Tom ordered

Weaver to take a step back from the car because Weaver "was very close to the

rear quarter panel." App'x at 162.[1] Again, Weaver complied, telling Tom that the

floor was slippery. App'x at 163.[2] Tom then began to pat Weaver's waistband

area.

By the time Tom patted Weaver, Weaver had complied with all of Tom's

commands without incident. Weaver's repeated compliance with Tom's orders

and the fact that his hands were visible throughout the entire encounter

demonstrate that "a reasonably prudent man in the circumstances would [not] be

warranted in the belief that his safety or that of others was in danger." *Terry*, 392

U.S. at 27. After all, the totality of the circumstances test allows for consideration

of "facts [that] might dispel reasonable suspicion." *Glover*, 140 S. Ct. at 1191. The

reality is that Tom felt safe enough to ask Weaver to go into his right pocket to

retrieve his identification. Tom also felt safe enough to place Weaver's

---

[1] This is the third "movement" near the waist that the majority describes as a specific articulable fact supporting reasonable suspicion. It tortures the English language to characterize the state of being close to a car as a movement. Furthermore, to the extent one might infer that Weaver sought to shield the area around his genitals from being patted by a stranger, the myriad innocuous explanations for this behavior are beyond obvious to any casual observer.
[2] Tom had previously testified that there was "snow on the ground." App'x at 66.

identification in his own pocket, which necessarily required Tom to momentarily shift his attention away from Weaver. All of this occurred before Tom first touched Weaver. A reasonably prudent man in these circumstances would not be warranted in the belief that his or others' safety is in danger.

The majority rejects the notion that even if it may have been reasonable for Tom to suspect that Weaver was trying to hide something, it was not reasonable for him to suspect that that something was dangerous. Its rationale is that the reasonable suspicion standard does not require officers to "rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2004). The majority unnecessarily extends *Arvizu* by holding that an officer "is not tasked with sorting through multiple possible scenarios and conducting a frisk for weapons only if that is the sole, or even the most likely, possibility." Maj. Op. at 52-53. The majority notes that the Court in *Arvizu* "reasoned that while some of the facts were 'susceptible of innocent explanation,' others were not, and taken together, the facts 'sufficed to form a particularized and objective basis for [the stop].'" Maj. Op. at 51 (quoting *Arvizu*, 534 U.S. at 277). But here, *every* fact, alone and in combination, is susceptible to an innocent explanation. The majority ignores the reality that officers sort through multiple scenarios on a constant

12

basis and consideration of consistent alternative explanations for conduct that is not in and of itself dangerous is necessarily required by the reasonable suspicion test. The Supreme Court has never held that officers have no obligation to consider alternative explanations for a person's conduct. This holding dilutes *Terry*'s reasonableness requirement and allows a court to rely solely on an officer's good faith belief that a person is armed and dangerous.[3]

The majority then discusses the circumstances of the traffic stop, namely, the fact that the backseat passenger opened his door into traffic and that there were three occupants in the car. The rear passenger's conduct has nothing to do

---

[3] *See, e.g.*, *Hussain*, 835 F.3d at 316 (reversing district court judgment in part because the person's "delayed responses at the early stages of his encounter with the police officers may have raised various suspicions—that he could not understand them, that he was not licensed to drive, that he was under the influence of alcohol or narcotics, that he was hiding contraband, and so on" but not that he was dangerous); *Padilla*, 548 F.3d at 183 (noting officer testimony that "he did not recognize [a waistband] gesture as being consistent with any innocent explanation"); *United States v. Jones*, 606 F.3d 964, 967 (8th Cir. 2010) (affirming district court's grant of motion to suppress because the officer "lacked the requisite reasonable suspicion that [the person] was carrying a concealed firearm in his hoodie pocket, as opposed to some other object, or no object at all"); *United States v. McKoy*, 428 F.3d 38, 40-41 (1st Cir. 2005) (affirming district court's grant of motion to suppress because defendant's act of appearing nervous and leaning in toward the car and reaching to his right, toward the center console of the car, was not "sinister or menacing" as it was "also consistent with reaching for a driver's license or registration, a perfectly lawful action").

with whether Tom had reasonable suspicion that Weaver was armed and dangerous. The reasonable suspicion inquiry is an individualized inquiry. Further, the majority ignores that the rear passenger complied with police requests to stay in the car and shut the door. The majority next discusses that there were three car occupants, reasoning that "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car." Maj. Op. at 54 (quoting *Maryland v. Wilson*, 519 U.S. 408, 414 (1997)). *Wilson* involved a traffic stop conducted by one officer, state trooper David Hughes. *Id.* at 410. Here, Tom was not alone. He was with two other officers: Quonce and Staub. Under these circumstances, the rationale holds less water.

The majority then discusses how Weaver looked at the officers' unmarked car prior to the traffic stop. In an attempt to bolster the reasonableness of the officers' suspicions, the majority characterizes Weaver's look as a "drawn-out look" though no officer described it as such. Maj. Op. at 55. Instead, the officers testified that Weaver looked for "probably a few seconds but it seemed longer than typically one would look at a vehicle." App'x at 95. Spending a few seconds looking at a passing car with tinted windows driving slowly by you can hardly

be described as suspicious, indeed, to ignore this sight might be a more unusual choice. However, the majority concludes that looking at an unmarked car with tinted windows is "consistent with the inference" of being "on the lookout for police precisely because [one] [i]s engaged in criminal activity that might include possession of a weapon." Maj. Op. at 56. The notion that looking at an unmarked car allows a reasonable inference that the person looking is engaged in criminal activity—let alone criminal activity involving a weapon—is absurd. The absurdity is all the more obvious when you consider that officers have cited both looking and not looking at them as a basis for a stop or a search. *See United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005) (looking straight ahead instead of at police officer); *Joshua v. DeWitt*, 341 F.3d 430, 446 (6th Cir. 2003) (looking back at police officers).

The majority fails to provide any support for its conclusion that looking at an unmarked car constitutes counter-surveillance of covert police activity. Instead, it cites to *United States v. Garcia* in a footnote. *See* Maj. Op. at 55, n.78 (citing 339 F.3d 116 (2d Cir. 2003)). *Garcia* involved a defendant "repeatedly engaging in what appeared to be counter-surveillance." *Id.* at 119. While *Garcia* itself provides no context for what the counter-surveillance consisted of, the

15

district court described that after receiving a reliable tip from an informant regarding a planned distribution of cocaine, at about 9 p.m., a Special Agent observed two men "emerge[] from [a] car, looking up and down the block although there was no street traffic," which was conduct that the Special Agent "interpreted" as "'counter-surveillance,' typical of people engaged in drug transactions" and the defendant conceded "was . . . a check for police activity." *United States v. Garcia*, No. 01 Cr. 35 (LTS), 2001 WL 1297791, at *1-2 (S.D.N.Y. Oct. 25, 2001). None of the three officers here testified that looking at an unmarked car for a few seconds constitutes "counter-surveillance" of police activity. *Garcia* does not support the majority's absurd inference.

Finally, the majority emphasizes that the traffic stop resulting in Tom's frisk of Weaver occurred in a neighborhood known for gun violence, dedicating an entire section of its opinion to the neighborhood's characteristics. The majority fails to address that there is nothing in the record indicating that the specific locations where Weaver was first seen walking or where the car was stopped had any connection to crimes. Further, the majority ignores research establishing that "[t]he racial composition of the area and the identity of the officer are stronger predictors of whether an officer deems an area high crime than the crime rate."

Brief for The Bronx Defenders, NAACP Legal Defense & Educational Fund, Inc., et al. as Amici Curiae Supporting Defendant-Appellant Calvin Weaver (No. 18-1697) ("Bronx Defenders' et al. Br.") at 23 (citation omitted).

Even if the officers' early observations made them suspicious—i.e., their observation of Weaver staring at the unmarked car, the passenger opening and then closing the car door, and Weaver's movements in the front seat when Tom approached the car—any suspicion should have dissipated by the time Weaver had exited the car and been entirely compliant with all of Tom's orders, especially considering that Tom had seen no visual or auditory indication that Weaver was armed and Weaver had done nothing to suggest he was dangerous. *See Florida v. Royer*, 460 U.S. 491, 500 (1983) ("[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."); *Terry*, 392 U.S. at 30 (frisk appropriate only "where nothing in the initial stages of the encounter serves to dispel [an officer's] reasonable fear for his own or others' safety"); *United States v. Watts*, 7 F.3d 122, 126 (8th Cir. 1993) ("The Fourth Amendment requires that a search not continue longer than necessary to effectuate the purposes of an investigative stop.").

Throughout its analysis, the majority gives short shrift to facts tending to dispel reasonable suspicion. It does not sufficiently discuss or consider Weaver's compliance with Tom's orders, the absence of a physical or auditory observation suggestive of weapon possession or dangerousness, that neither Weaver nor any other car occupant was suspected of having committed a crime, and that Weaver's action of moving his hands downward should have eliminated suspicions of dangerousness because he was attempting to "mak[e] whatever he wished to keep private less – not more – readily available." Appellant's Reply Br. at 7-8.

The majority's reasonable suspicion inquiry thus relies only on an officer's subjective good faith belief that an individual is armed and presently dangerous. Under the majority's reasoning, "the protections of the Fourth Amendment . . . evaporate" and "the people [are] secure in their persons, houses, papers and effects, only in the discretion of the police." *Terry*, 392 U.S. at 22 (internal quotation marks omitted). If the Fourth Amendment is to mean anything at all, it must at a minimum mean that the circumstances here do not amount to specific and articulable facts supporting a belief that a person is armed and dangerous. To hold otherwise is to ignore the reality that Weaver's fate was sealed the

18

moment these officers laid eyes on him. The majority's decision will increase the misuse of frisks, with innocent persons bearing the brunt of the increased frequency of frisks. *See, e.g., Floyd v. City of New York*, 959 F. Supp. 2d 540, 558 (S.D.N.Y. 2013) ("[I]n 98.5% of . . . 2.3 million frisks [by the New York Police Department], no weapon was found.").

## II. An Officer's Order To Assume a Spread Eagle Position Marks the Start of a Search.

As the original panel concluded, an officer's order to assume a spread eagle position marks the start of a search. It requires reasonable suspicion that the person is armed and dangerous when the officer gives the order. That order constitutes a search because any reasonable person being ordered to assume the spread-eagle position reasonably expects to be searched.

It is well-established that "to proceed from a stop to a frisk, [a] police officer must reasonably suspect that the person stopped is armed and dangerous." *Johnson*, 555 U.S. at 326-27. An officer's order that a person spread eagle marks the point where a traffic stop proceeds from a stop to a frisk. To a reasonable person, the order objectively begins the "serious intrusion upon the sanctity of the person." *Terry*, 392 U.S. at 17.

19

In *Terry*, the Court explained that "[a] thorough search . . . of [a person's] arms and armpits, waistline and back, the groin and area about the testicles, and entire surface of the legs down to the feet" that is "performed in public by a policeman while the citizen stands helpless" is a "serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment." *Id.* at 16-17, 17 n.3 (internal quotation marks omitted). There is no good reason to divorce an officer's actual touching from an officer's immediately preceding order that allows that touching to take place. After all, it is the officer's action that must be "justified at its inception," *id.* at 20, and a command is an action. An officer acts when he commands a person to stand spread eagle. *See, e.g.*, *Doornbos v. City of Chicago*, 868 F.3d 572, 581 (7th Cir. 2017) ("As with 'seizures,' an officer can initiate a frisk before physically touching a person."); *Thomas v. Dillard*, 818 F.3d 864, 888 (9th Cir. 2016) ("Once [the officer] initiated [plaintiff's] detention for the purpose of a weapons frisk, the constitutional violation was complete."). There is no reason to order a person to spread eagle other than to commence a frisk. To the extent the majority thinks there are "a host of reasons why an officer might order a person" to assume an in-search

20

position, Maj. Op. at 43, this case does not present one of those instances, as Tom's order was given precisely so that he could frisk Weaver.

The majority disagrees. It characterizes an order to spread eagle as an "as-yet-unexecuted intention to conduct a frisk." Maj. Op. at 33. But commanding someone to spread eagle is not an "as-yet-unexecuted intention" or internal thought, it is an act that objectively signals to any reasonable person that a frisk will commence. The command itself establishes the officer's "attempt to find something or to obtain information." *United States v. Jones*, 565 U.S. 400, 408 n.5 (2012). Further, the majority's opinion that commanding someone to spread eagle falls short of a frisk until physical contact is made cuts against Supreme Court precedent rejecting "rigid all-or-nothing model[s] and regulation[s]" in the Fourth Amendment context and instructing that we cannot "isolate from constitutional scrutiny the initial stages of contact between the policeman and citizens." *Terry*, 392 U.S. at 17.

The majority contends that holding that a search begins when an officer orders a person to spread eagle would wrongly conflate search and seizure law because the search doctrine is not concerned with how a reasonable person

would interpret an officer's action. There are two problems with the majority's rationale.

First, searches and seizures share some common attributes. *See Jones*, 565 U.S. at 408, n.5 ("[A] seizure of property occurs, not when there is a trespass, but when there is some meaningful interference with an individual's possessory interests in that property. Likewise with a search.") (internal quotation marks and citation omitted); *see also Florida v. Royer*, 460 U.S. 491, 500 (1983) (discussing that "[t]he scope of [a] search must be strictly tied to and justified by the circumstances which rendered its initiation permissible" and "[t]he scope of [a] detention" with respect to seizures "must be carefully tailored to its underlying justification.") (internal quotation marks omitted). The doctrines work hand in hand.

This brings me to the second problem with the majority's rationale. "[T]he ultimate touchstone of the Fourth Amendment is reasonableness." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (internal quotation marks omitted). The majority is correct that a search occurs when an officer "obtains information by physically intruding on a constitutionally protected area," or intrudes into a person's expectation of privacy that "society is prepared to recognize as

reasonable." *Carpenter v. United States*, 138 S. Ct. 2206, 2213, 201 L.Ed.2d 507 (2018) (internal quotation marks omitted). But search doctrine does not foreclose consideration of whether a reasonable person would have believed that he or she was being searched —indeed, focusing on reasonableness is consistent with the Fourth Amendment's text and its purpose. Whether a reasonable person would consider an officer's action as the start of a search is a similar inquiry to whether an officer's action intruded into a person's reasonable expectation of privacy.

Turning to the majority's test for when a verbal order constitutes a search, the majority's opinion acknowledges that some verbal orders constitute searches. The government expressly acknowledges that to be true as well. However, the majority's opinion provides no guidance whatsoever as to the types of verbal orders that would constitute a search, except to say that the order at issue here was not such an order. The government distinguishes an order that a person place their hands against a car and spread their legs open from an order that a person remove their clothes down to their underwear and pull out their bra and an order that a person empty their pockets and lift their shirt. The government ignores that each of these orders direct a person to increase exposure to an area that the person reasonably seeks to preserve as private, e.g., their body parts. *See*

Appellant's Br. at 34-35 (discussing exposure to "private areas that, though likely covered in clothing, are typically kept out of public view.").

The majority ignores that this case implicates the reasonable expectation of privacy prong. A person's "subjective expectation of privacy" can be "inherent in [their] account of [an official action] as embarrassing, frightening, and humiliating." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 374-75 (2009). Amici curiae note that an order that a person spread eagle is "degrading for the person being forced to assume [that] uncomfortable and undignified position." Bronx Defenders' et al. Br. at 10. Here, Weaver was required to assume this spread-eagle position in public. To a casual observer, and to the person themselves, bending forward on the trunk of a car with one's legs spread apart may seem more exposed and revealing than displaying contents of one's pockets or the skin of one's torso.

III. **The Supreme Court's Decision in *Whren* Continues to Have Unjustifiably Tragic Consequences.**

The Supreme Court's decision in *Whren v. United States*, which held that the Fourth Amendment allows officers to stop a driver or passenger for an impermissible reason, such as their race or gender, if the officer has probable cause that a traffic law violation has occurred no matter how minor the violation,

24

continues to have unjustifiably far-reaching and detrimental ramifications. 517 U.S. 806, 813 (1996). Pretextual traffic stops disproportionately target people of color, increase the dangers to drivers and passengers, and fail to have a deterrent effect on serious crime.

Because state traffic laws prohibit many innocuous activities, such as hanging air freshener from a rearview mirror or having a loud exhaust, "probable cause as to a minor traffic violation can be so easily come by that its existence provides no general assurance against arbitrary police action." WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 1.4(f) (6th ed. 2020). Simply put, "[i]f an officer follows any motorist long enough, the motorist will eventually violate *some* traffic law, making any citizen fair game for a stop, almost any time, anywhere, virtually at the whim of police." *See* Stephen Rushin & Griffin Edwards, *An Empirical Assessment of Pretextual Stops and Racial Profiling*, 73 Stan. L. Rev. 637, 641 (2021) (internal quotation marks and alterations omitted). The victims of police officers' whims are disproportionately people of color.

Black drivers are more likely to be pulled over by police officers than white drivers, and police officers search stopped black and latino drivers twice as often

25

as stopped white drivers, despite data suggesting searches of these black and

latino drivers are less likely to discover guns, drugs, or other illegal contraband.[4]

As a distinguished black educator has noted, "there's a moving violation that

many African-Americans know as D.W.B.: Driving While Black." Henry Louis

Gates, Jr., *Thirteen Ways of Looking at a Black Man*, New Yorker (Oct. 16, 1995).[5]

Research also suggests that court decisions that expand police discretion, such as

*Whren*, contribute to racial discrimination in policing. For example, an empirical

analysis of more than eight million traffic stops conducted by the Washington

State Patrol from 2008 through 2015 demonstrated that the Washington Supreme

Court's easing of its restriction on pretextual traffic stops led to a statistically

---

[4] *See* Emma Pierson, et al., *A Large-Scale Analysis of Racial Disparities in Police Stops Across the United States*, 4 Nat. Hum. Behav. 736, 737, 739 (2020) (detailing results of analysis of "approximately 95 million traffic stops from 21 state patrol agencies and 35 municipal police departments" from 2011 through 2018); *see also* Alex Chohlas-Wood, et al., *An Analysis of the Metropolitan Nashville Police Department's Traffic Stop Practices*, Stan. Computational Pol'y Lab, at 2 (Sept. 19, 2018), https://policylab.stanford.edu/media/nashville-traffic-stops.pdf (noting that "the stop rate for black drivers in Nashville in 2017 was 44% higher than the stop rate for white drivers," and the disparity increased to 68% for non-moving violations, e.g., broken taillights or expired registration tags.).

[5] https://www.newyorker.com/magazine/1995/10/23/thirteen-ways-of-looking-at-a-black-man.

significant increase in traffic stops of drivers of color relative to white drivers. *See*

Rushin & Edwards, 73 Stan. L. Rev. at 642-43.

Traffic stops can be particularly dangerous, and even fatal, for motorists.[6]

On April 11, 2021, just a few days before this Court's en banc hearing in this case,

an officer fatally shot Daunte Wright, a 20-year-old black man, during a traffic

stop. *See* Nicholas Bogel-Burroughs & Julie Bosman, *The Minnesota Officer Who*

*Killed Daunte Wright Was Charged with Manslaughter*, N.Y. TIMES (Apr. 14, 2021).[7]

A Minnesota police officer killed Philando Castile, a black man, after pulling him

over for a broken taillight. *See* TJ Grayson & James Forman Jr., *Opinion: Get Police*

---

[6] At the same time, research based on an analysis of over 4,200 cases of violence against officers during traffic stops across more than 220 law enforcement agencies in Florida over a ten-year period revealed that violence against police officers during a traffic stop is rare. *See* Jordan B. Woods, *Policing, Danger Narratives, and Routine Traffic Stops*, 117 MICHIGAN L. REV. 635, 639, 640 (2019) (explaining that "[t]he narrative that routine traffic stops are fraught with danger to the police . . . finds little support in existing studies or data" and noting that the study's findings, including that the rate of a felonious killing of an officer during a routine traffic stop was only 1 in every 6.5 million stops, "do not support the dominant danger narrative surrounding routine traffic stops.").
[7] https://www.nytimes.com/2021/04/14/us/kim-potter-charged-daunte-wright.html.

*Out of the Business of Traffic Stops*, WASHINGTON POST (Apr. 16, 2021).[8] Of all fatal shootings by police in 2015, about 11 percent occurred during traffic stops. *Id.*

The increased dangers to motorists from traffic stop encounters with police are not justified by public safety concerns. A report analyzing approximately 246,000 traffic stops in Nashville, Tennessee, in 2017 concluded that there was "little evidence of . . . a connection between traffic stops and serious crime levels in Nashville." Chohlas-Wood, at 2. Specifically, there was no evidence that traffic stops deterred future crime or led to apprehension of persons responsible for past crimes. *Id.* In fact, only 1.6% of traffic stops led to a custodial arrest, and the arrests were most often for non-violent crimes, such as license violations or drug possession. An additional 5.8% of traffic stops resulted in a misdemeanor citation for offenses such as driving without a valid license. *Id.* Further, "despite substantial reductions in stop rates " from 2011 through 2017, "crime levels . . . remained steady" and "week-to-week changes in area-specific stop rates were uncorrelated with changes in local crime levels." *Id.*

---

[8] https://www.washingtonpost.com/opinions/2021/04/16/remove-police-traffic-stops/.

It is time that we stop ignoring the tragic ramifications of *Whren*. We must not expand *Whren* to the point where law enforcement conduct with little public safety benefit that disproportionately impacts communities of color is beyond the reach of the Fourth Amendment.

The majority's decision does not adequately protect the Fourth Amendment right of all persons to be free from unreasonable searches and seizures. It is our responsibility to safeguard against overbearing or harassing police conduct that does not meet the requisite objective evidentiary justification. Legitimate concerns with law enforcement safety cannot override the narrow scope of the exception to the warrant requirement at issue. I therefore must respectfully dissent.

GUIDO CALABRESI, *Circuit Judge*, dissenting, joined by ROSEMARY S. POOLER and DENNY CHIN, *Circuit Judges*:

The majority begins its opinion by saying that this is an ordinary case of an ordinary police search. That, unfortunately, is all too true. But though ordinary, and very common, the facts of this case, and the fact that a strong majority made up of thoughtful judges comes out as it does, demonstrates beyond peradventure why this area of the law is so disastrous.

I will begin my sad but respectful dissent by describing this case completely apart from Supreme Court cases and precedents of our Court. That is, I will describe the facts of this case as an ordinary person would see them and react to them. I will then describe the law and why, under that law, this case is a close one and how, given what the ordinary person would think of such a situation, we got to such a state in the law. Next, I will argue that despite the unfortunate state of the law, this case could have, and hence should have, come out the opposite way. Although the law has taken us badly down a slippery slope, we could, in this case, say "stop," and go no further.

1

I

I have no doubt that the ordinary person looking at the facts of this case would conclude that the officers decided to search Weaver based on a hunch or a stereotype, and then went about finding a way to search him.

Consider, first, what the police knew about Weaver before they stopped the car in which he was a passenger. The police were "proactively" engaged in looking for crime in what they described as a "high-crime" area. App'x 91. Weaver—an African-American man—walked along Merriman Avenue, and he looked at an unmarked police car with tinted windows for "several seconds," *id.* at 150–51, or "a few seconds," *id*. at 95, 174. As the unmarked police car kept moving away from Weaver, Officer Tom observed through the passenger sideview mirror that Weaver "adjusted his waistband," *id.* at 151, or, more specifically, gave his waistband a "subtle tug . . . , like an upward tug motion," pulling up his pants, which "were lower than waist level," *id.* at 152. The police then saw Weaver get into a gray sedan.

The police followed that car until they had a valid reason to stop it. What was that reason? The car was traveling on Davis Street and stopped when it reached Delaware Avenue. Drivers can make only a right turn at that intersection

2

and the driver proceeded to signal a right turn before turning onto Delaware Avenue. The driver, however, had failed to signal that turn over one hundred feet before the intersection, as required by New York law. On that basis, the police turned on their emergency lights and signaled the driver of the gray sedan to stop.

Such traffic infractions are commonplace—they have been so since cars first transformed American life in the early twentieth century. *See* Sarah A. Seo, Policing the Open Road: How Cars Transformed American Freedom, 26-27 (2019). The ordinary person might muse: how often are most people stopped for failing to signal, let alone for signaling too close to the corner? And our ordinary observer would conclude that the failure to signal at the appropriate time was actually just an *excuse* to stop the vehicle.

Once the car was stopped, the passenger in the backseat opened his door as if to get out, but closed it following a police order to do so. Officer Tom approached the vehicle, he looked at Weaver, and he saw Weaver "slouched down pushing down his pelvic area and kind of squirming in his seat," with his hands making a "downward shifting motion." App'x 158–59. He then ordered Weaver, "show me your hands, show me your hands." *Id.* at 159. Weaver complied with this order

3

and stated, "I don't got nothin.'" *Id.* Officer Tom then asked Weaver to reach into his pocket area and retrieve his identification, which Weaver did.

Without more than this combination of actions—Weaver's glancing at the unmarked police car for "a few seconds," his hitching his pants, and "squirming" in his seat while making a "downward shifting motion" with his hands at his waistband—the police ordered Weaver out of the car, "direct[ed] him towards the rear quarter panel trunk area of [the] vehicle" *and* "ask[ed] him to place his hands on the trunk of the vehicle," *and* "position himself with his feet spread apart." *Id.* at 161. Weaver complied. *Id.* at 162.

To the ordinary observer, it would be obvious that Officer Tom decided to search Weaver long before he ever laid hands on him. And that he did so not because of any fear that Weaver might be armed and dangerous, but because he had a hunch that Weaver might be hiding something criminal, probably drugs. It is also obvious that this was why he ordered Weaver to assume a demeaning position that would enable this search.

The ordinary person considering these facts would conclude that the officers wanted to search Weaver when they first saw him, that they found a way to do so, and that their guess turned out to be right—Weaver was a felon with a gun and

cocaine. The ordinary observer might not know that the only reason that such hunch-based searches are permitted is if there is a sound, objective reason to believe that the person searched was armed and dangerous. And so our observer might conclude, good for the police! They caught someone. Or so might such a person conclude until learning that (as amici tell us) in the overwhelming number of such hunch-searches, the person searched and demeaned was *not* a criminal but an ordinary innocent person![1]

Our ordinary observer might then stop and wonder: wait, is that all it takes? A look and a tug, a delayed turn signal, and adjusting yourself in your seat, and now you are asked to step out and spread eagle across the trunk of a car? The ordinary observer might then ask: could this happen to me?

Because this is a discomforting thought, I think many people would go on to find ways to distinguish themselves from Weaver. Unlike Weaver, many are fortunate not to live in so-called "high-crime areas." And many might comfort

---

[1] *See* Br. of Amici Curiae N.Y. Civil Liberties Union Foundation *et al.*, ECF No. 126, at 4–5 ("NYCLU Br."). By way of example, amici point to their lawsuit against the New York Police Department, which challenged the Department's stop-and-frisk policies. Uncontested evidence from that lawsuit showed that out of 2.3 million *Terry*-frisks the NYPD conducted between January 2004 and June 2012, the person frisked turned out to be completely innocent in at least 90% of cases. Only 1.5% of frisks resulted in the discovery of a weapon of any kind, and only 0.1% of frisks resulted in the discovery of a gun. *See Floyd v. City of New York*, 959 F. Supp. 2d 540, 573–74, 574 n.118 (S.D.N.Y. 2013).

themselves with the thought that they have nothing to fear from the police. The police don't look for people like us! Some observers might even tell themselves that the color of their skin would preclude police officers from forming such a suspicion about them in the first place.[2]

I believe that drawing such lines to render acceptable actions that search and demean perhaps as many as ninety-nine innocent people to catch one dangerous crook, because those actions befall only "others," reflects the deeply troubling state of our Fourth Amendment law. It is worth considering how we got here.

## II

The trouble with the state of our Fourth Amendment jurisprudence is that it presents judges with a cognitive conundrum that leads us to defer to the police and then to rationalize this deference by drawing lines between us and the would-be subjects of police action. Let me explain this problem and how, as I noted in my earlier panel concurrence in this case, it arises from the interaction of two doctrines: the exclusionary rule and qualified immunity.

---

[2] Alternatively, some people might be tempted to exaggerate the suspiciousness of Weaver's conduct. For instance, in the instant case, the majority emphasizes how long Weaver stared at the officers' unmarked vehicle. Maj. Op. at 12. But before the district court, Officer Tom described only a "stare[]" or "look[]" "for as long as it took for us to pass [Weaver]," or about "a few seconds," App'x 174.

6

The exclusionary rule, as a way of controlling police behavior, has been a disaster. Do not get me wrong: some way of keeping the police from undertaking unreasonable searches and seizures is essential. And exclusion of wrongfully found evidence seemed a plausible way. But in practice it has led to a slow and steady erosion of rights to be free from unreasonable searches and seizures.

Courts are—and should be—guided by precedents. But the nature of precedents is that a case asserting an improper search and therefore seeking the exclusion of evidence is likely to be, on its facts, just a step from an earlier case in which police behavior was held to be justified and in which the evidence found was admitted. And even though we mouth the rule that any Fourth Amendment exception ought to be "jealously and carefully drawn," *Jones v. United States*, 357 U.S. 493, 499 (1958), we can't avoid the fact that the defendant before us seeks to exclude evidence that virtually always demonstrates guilt, combined frequently with dangerousness.

The officers' hunch or stereotype in the cases courts see was correct! Courts do not want to release criminals; such criminals have done and may again do harm. And so, often and understandably, courts take "the next step," and hold the

search in the case they face to have been reasonable. To do otherwise would have led to the release of a criminal.

Thus, this "next step" case becomes the precedent for the subsequent "close case." Through a series of holdings, each one driven by the desire to avoid excluding determinative evidence, we have approved, on one ground or another, successive forms of increasingly unreasonable police actions, until we find ourselves reviewing actions that would seem—to the ordinary observer—to be obviously improper but which, instead, on our precedents—on governing law—are "close."

This string of "next step" precedents comes at a cost that courts cannot easily assess. What about all the cases in which the police behavior turned out to be unjustified? What about all the cases in which the hunch or the stereotype was wrong, and an honest person was humiliated, seized, searched, and all too often maltreated? Why don't the courts see those cases—which amici in this case assert are at least ninety out of a hundred[3]—and in them set down rules reinforcing the constitutional mandate? Recent events more than suggest that a multitude of such

---

[3] NYCLU Br. at 4–5.

8

cases exist, and that they feed distrust and even hatred of the police, with dire consequences. Why don't these cases get to court?

The reason is obvious. Persons wrongly seized or searched may well not know that they can bring a lawsuit, or they may be too disaffected to sue. But even if they go to a lawyer, the lawyer will tell them—ah yes, you have been mistreated, but you won't recover; the case is fairly close and so the officer would surely have qualified immunity.[4]

Sue if you want, but I can't take your case on a contingent fee because the odds are too great that, though the police behavior was wrong, the issue is a close one and therefore, under current precedents, we won't win. And, by the way, you most likely will not even get a decision on whether the behavior was wrong, because the court is unlikely to reach that question given the operation of qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (eliminating the

---

[4] The doctrine of qualified immunity protects government officials, including police officers, from lawsuits for civil damages so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When an official raises qualified immunity as a defense, a court must consider whether (1) the official violated a statutory or constitutional right, and (2) whether the right was "clearly established" at the time of the challenged conduct. *See Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Since cases in which innocent people are wrongly searched are almost invariably close, on their facts, to previous ones in which the police behavior was not disapproved, they almost inevitably give rise to qualified immunity.

requirement that courts first decide whether a public official's conduct violated the Constitution before reaching qualified immunity).

There may well be thousands of situations in which a search or seizure like the one before us today turned up nothing. But hardly any will get to court. And even these will almost always get decided against the person subjected to potential police misconduct because of qualified immunity.

This, then, is the cognitive problem our jurisprudence has created. In the relatively few cases of potentially unreasonable police behavior that come before us, the police have found something criminal, leaving us understandably predisposed to think that their suspicion was indeed reasonable. That predisposition is magnified by the exclusionary rule's all-or-nothing stakes—limit police behavior only by releasing a wrongdoer—and results in a body of deferential, "close case" precedents. These precedents in turn, and through qualified immunity, keep those cases—which might otherwise afford an opportunity to address potential police misconduct and vindicate Fourth Amendment rights—out of our sight.

The cognitive bias created by the exclusionary rule and qualified immunity might not be so atrocious if courts had a way of cutting through it—if, perhaps,

they understood directly and emotionally, from personal experience, the perspective of those innocents who are improperly and humiliatingly searched or seized. But we judges, and our children, families, and friends, are not likely to be the ones whom the police decide to search on a hunch, or simply because we looked at an unmarked car with tinted windows and pulled up our pants. We are not likely to be stopped for failing to signal at the correct time. And we are most unlikely to be made to bend over, spread eagled against the trunk of a car, even if stopped.

Indeed, much as ordinary observers might, we judges, too, are likely to conceive of police misconduct as something that happens to others and not to us. This, in turn, makes it much easier to accept police conduct that is pretextual—in other words, not honest—simply because it also serves a useful purpose. That is one of the terrible problems with *Whren v. United States*, 517 U.S. 806 (1996).

*Whren* excuses an officer's stop of a car for a traffic infraction even when the traffic infraction is not the real reason for the stop. In other words, it permits pretextual stops, and—as such—it inevitably encourages stereotyping. When a pretextual stop results in the discovery of criminal activity—as it did here—we might feel that, on balance, such tactics are worth a cost that seems, to us, "*de*

11

*minimis.*" One fewer crook, one fewer gun, one fewer vial of cocaine on the streets. But such a rationalization is only possible because we ourselves do not feel the cost of that bargain.

We are not the ones who are stopped and made to spread eagle. The price for what we believe to be greater public safety will be borne disproportionately by "them, whoever "they" may be. As a result, we are only willing to say, "stop," in those situations in which the challenged police practices are ones that might make *us* the subjects of police actions. *See, e.g.,* Transcript of Oral Argument at 9-10, *United States v. Jones*, 565 U.S. 400 (2012) (No. 10-1259) ("CHIEF JUSTICE ROBERTS: You think there would also not be a search if you put a GPS device on all of *our* cars, monitored *our* movements for a month? . . . MR. DREEBEN: The Justices of this Court? CHIEF JUSTICE ROBERTS: Yes. (Laughter.)" (emphases added)). The Court in *Jones* found the police action violative of the Fourth Amendment.[5]

---

[5] The majority remarks that judges also "are not exposed to the same dangers faced by police officers during traffic stops." Maj. Op. at 30 n.42. That is surely so. But it is also the case that federal judges, because of our experiences and backgrounds, have spent a great deal of our time listening to, and inevitably sympathizing with, the risks that police must face. There is nothing wrong with that. But we must also acknowledge that we may be more inclined to understand and sympathize with what police go through

Do not misunderstand me. I am not saying the police are acting out of racist motives. *Whren* says that would violate the Equal Protection Clause. The police are trying to catch crooks. And they are permitted to use the most dubious of tactics not because courts are racist but because courts are "care-less." That is, we do not see, and so do not care, because we intuit that *that* kind of search or seizure won't happen to us.

Again, let me be clear, I am not blaming anyone for this lack of caring. It is a profoundly human attribute, to which I am as subject as anyone else. The failure to appreciate a burden because it falls only on others is so universally human that it can only be controlled structurally. And, as in so many things, the framers of our Constitution understood that. They knew that we would all vote for parks or roads if we did not have to bear their costs. Having a park is eminently desirable if I don't need to pay for the land it is built on. So, the framers required that

---

than with the experiences of the innocent people on the other side of potentially degrading police interactions.

Likewise, the majority chides that judges do not live in "high-crime" areas and therefore do not feel the need for safety there. *Id*. I believe the ordinary person would probably conclude that those who live in "high-crime" areas may very well want the kind of evidence-based community policing that protects people from crime. But I see no indication that people who live in these neighborhoods are sympathetic to police practices that subject their neighbors—the overwhelming majority of whom are completely innocent—to demeaning, degrading, and potentially violent police interactions on the basis of an officer's hunch or stereotype.

property—one of their greatest concerns—could only be taken for a public purpose *if* the takers paid compensation. Unlike the framers, we have established structural norms that, as to the issues in the case before us and in many other similar areas, make it infinitely easier to let the burdens that accompany possibly desirable actions fall only on "them." [6] The result is injustice.[7]

## III.

Even given this unfortunate state of the law, this case could have and so should have come out the other way. In my view, the district court and the *en banc* majority commit two related errors.

## A.

First, they fail to consider whether instructing Weaver to spread eagle against the hood of the car amounted to a seizure that was additional to and exceeded both (a) the permissible temporary seizure of the sedan and its

---

[6] At the end of its opinion, the majority emphasizes that no allegations of racism have been made in this case. Maj. Op. at 62–64. That is of course exactly consistent with what I say is the problem in cases of this sort. It is not that there is overt evidence of racism—if there were, these could be dealt with under the Equal Protection Clause—it is that those who are acting and those who are deciding too often do not care about the burdens placed on others, because they do not bear them and they do not empathize with those who do.

[7] Oddly, neither the exclusionary rule nor qualified immunity nor the *Whren* doctrine are legislatively based. They are all Supreme Court creations.

14

passengers as part of a lawful traffic stop, *see Whren*, 517 U.S. at 813, and (b) the permissible order that Weaver get out of the stopped car, *see Maryland v. Wilson*, 519 U.S. 408, 414–15 (1997).

The majority fails to consider meaningfully whether this additional seizure—the requiring of presumably innocent persons to spread eagle—was justified by the evidence then available to the police. In a footnote, it dismisses what Weaver was ordered to do here—exit the car, place his hands against the rear of the car, bend over, and spread his legs—as a trifling intrusion, no more inconveniencing than being asked to step out of a car to the side of the road, or even to step out with one's hands in the air. *See* Maj. Op. at 38 n.57. That is simply wrong. Ordering a passenger in a car to spread eagle may not be as intrusive a seizure as putting handcuffs on such a passenger, but it is close. And accordingly, under existing cases it requires an objective justification. [8]

---

[8] Judge Lohier in his concurring opinion declines to reach this issue, because it was not raised before the district court. *See* Concurring Op. (Lohier, *J*.) at 3 n.1. But it is well within our discretion to decide the issue even if it was not raised below. *See Singleton v. Wulff*, 428 U.S. 106, 121 (1976). I think it appropriate to do so. Significantly, the *en banc* court requested briefing on this very issue, and the parties argued it in their *en banc* briefs, *see* Br. for Defendant-Appellant Calvin Weaver on Rehearing En Banc, ECF No. 109, at 30–33, Br. for Appellee United States on Rehearing *En Banc*, ECF No. 113, at 28–32.

15

The majority devotes much of its energy to the question of when the search of Weaver began, because, it insists, "this is a case about searches, not seizures." Maj. Op. at 35. As the majority sees it, "Weaver, the driver, and the back-seat passenger were seized from the moment the police stopped their vehicle." *Id.* at 35 n.51; *see also id.* at 38 n.58.

And it is indeed settled that in Fourth Amendment terms, a traffic stop entails the seizure of the driver as well as any passengers. *See Brendlin v. California*, 551 U.S. 249, 255 (2007). It is also settled that Weaver, having been seized as part of the lawful traffic stop, was not free to "move about at will." *See Arizona v. Johnson*, 555 U.S. 323, 333 (2009). Moreover, the police could also have asked him, without any suspicion, to step out of the car pending completion of the stop. *Wilson*, 519 U.S. at 414–15. In crafting this car-exiting rule, the Supreme Court acknowledged that in a lawful traffic stop, there is no probable cause to believe a *passenger* has committed the instant traffic offense, but it reasoned that "the additional intrusion on the passenger is minimal" and outweighed by concern for officer safety. *Id.* After all, "as a practical matter," the passenger is already stopped because the vehicle is stopped, and "[t]he only change in [the passenger's]

16

circumstances which will result from ordering them out of the car is that they will be outside of, rather than inside of, the stopped car." *Id.* at 413–14.

But Weaver was ordered to do much more than step out of the car following the traffic stop. His circumstances did not simply change from being inside a car to being outside it. He was ordered to move to the rear of the car, put his hands on the trunk, bend over, and spread his legs. Such an order goes far beyond the "minimal" additional intrusion of stepping out of a car permitted under *Wilson*, and it goes beyond the purpose of the initial traffic stop. *See Terry v. Ohio*, 392 U.S. 1, 20 (1968) (explaining that the unreasonableness of a seizure depends in part on "whether it was reasonably related in scope to the circumstances which justified the interference in the first place").

Ordering Weaver to spread eagle amounts to an additional seizure. This comports with cases from several of our sister circuits, which have held that ordering a pedestrian to spread eagle is indeed a seizure. *See United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014) ("We can see no basis for classifying Brodie's action—putting his hands on the car when told to do so by the police—as anything other than full compliance with the officer's request."); *United States v. Brown*, 448 F.3d 239, 246 (3d Cir. 2006) ("Brown first yielded to Santiago's authority by turning

17

to face the police car and placing (or moving to place) his hands on the vehicle.");

*United States v. Brown*, 401 F.3d 588, 595 (4th Cir. 2005) ("Brown was seized, and his Fourth Amendment rights triggered, at least as early as when he submitted to Officer Lewis' order by leaning toward and placing his hands on the adjacent car.").

The additional order to spread eagle, because it is a seizure additional to and beyond the "traffic-stop seizure," must, to be reasonable, require suspicion beyond the officers' initial justification for the traffic stop and its completion. This follows from *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) (per curiam), where the Court held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment[]," *id*. at 111 n.6, because the government's "legitimate and weighty" interest in officer safety outweighs the "*de minimis*" additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle, *id*. at 110–11.

Citing *Terry*, the Supreme Court in *Mimms* further held that a driver, once outside the stopped vehicle, may be patted down for weapons *if* the officer *"reasonabl[y] concluded that the person whom he had legitimately stopped might be armed*

18

*and presently dangerous." Id.* at 112 (emphases added); *see also Johnson*, 555 U.S at 332. In other words, doing something more intrusive than ordering a person out of the car requires some quantum of suspicion independent of the officers' initial justification for the traffic stop. Accordingly, and following the explicit language of the Fourth Circuit, I would hold that to be reasonable, such a seizure requires "a reasonable, articulable suspicion that criminal activity was afoot and that [the person seized] was armed and dangerous," *Brown*, 401 F.3d at 595. In the case before us, the district court failed even to consider whether, at the time Weaver was ordered to spread eagle, there was sufficient evidence to justify the spread eagle order, and the majority wrongly affirms that failure.[9]

The majority, thus, seems to violate a quite ordinary Fourth Amendment principle: what may begin as a reasonable, lawful stop becomes unreasonable and

---

[9] In footnotes, the majority provides several justifications as to why there was no additional seizure. At one point, it seems to suggest that it needn't be concerned with any additional seizure because the argument was not made below, and the high bar attendant to plain error review was not met. *See* Maj. Op. at 38 n.57. At another point, it seems to say that there could be no additional seizure because Weaver was already seized. *Id.* at 38 n.58. Finally, it seems to suggest that being made to spread eagle is trivial and no different than being asked to step out of a car. *Id.* at 38 n.57. On these points, the majority is plain wrong. As I have explained, under *Brendlin*, *Johnson*, and *Mimms*, the officers could have asked Weaver to step out of the car because the car was lawfully seized. But to order him to spread eagle across the trunk of a car required more. Nor do I think it can be reasonably argued that being made to spread eagle against the trunk of a car is only a "marginally greater intrusion" than exiting a car. *Id.* The ordinary person would certainly not think that.

19

therefore unlawful once police undertake greater and more invasive intrusions absent independent, individualized suspicion. *See, e.g.*, *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) ("An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."); *Knowles v. Iowa*, 525 U.S. 113, 117 (1998) ("[W]hile the concern for officer safety in this context may justify the 'minimal' additional intrusion of ordering a driver and passengers out of the car, it does not by itself justify the often considerably greater intrusion attending a full field-type search."); *United States v. Place*, 462 U.S. 696, 706, 707–10 (1983) (explaining that "brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interests that strong countervailing governmental interests will justify a seizure based only on specific articulable facts that the property contains contraband or evidence of a crime," but holding that a ninety-minute detention of personal effects based only on reasonable suspicion was unreasonable).[10]

---

[10] To be sure, an additional intrusion such as an order to spread eagle or even handcuffing may be permissible without suspicion in other Fourth Amendment contexts, such as the execution of a valid search warrant. *See Michigan v. Summers*, 452 U.S. 692 (1981). But in that instance, the additional detention "represents only an incremental intrusion on personal liberty when the search of a home has been

20

I also think it plain that the order to spread eagle is not so minimally intrusive as to be excusable in the interest of officer safety when that concern can be just as well addressed by ordering the passenger out of the car, perhaps even with hands in the air. Of course, if an officer does have *reasonable articulable suspicion* to believe the passenger in a stopped car is armed and dangerous, that officer may rightly conduct even a full *Terry*-frisk. But to order passengers to spread eagle—simply because the car in which they are riding has been stopped for a traffic infraction—erodes directly the constitutional mandate against unreasonable searches and seizures. To spread eagle across the trunk of a car is personally invasive, demeaning, and publicly humiliating. It is to "stand[ ] helpless," exposed, in public. *Terry*, 392 U.S. at 16–17. Such a procedure, when ordered without adequate justification, becomes demoralizing and dehumanizing, and "it is simply fantastic to urge that such a procedure" is a mere "'petty indignity.'" *Id.*

---

authorized by a valid warrant," and the existence of the search warrant itself "provides an objective justification for the detention. . . . [A] neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home." *Id.* at 703.

Failure even to consider whether there was adequate justification on the basis of the evidence available when Weaver was ordered to spread eagle is, therefore, not only wrong but contrary to Supreme Court and other circuit holdings. Accordingly, the proper course would be to hold that, since Weaver was further seized when he submitted to Officer Tom's order to spread eagle, we must remand for the district court to consider whether, consistent with the Fourth Amendment, this additional seizure was independently supported by adequate, individualized suspicion.

## B.

Second, I believe the majority need not read *Whren* and its sequelae so expansively complacent with police pretexts as it does. *See* Maj. Op. 42 n.61. *Whren* says only that a court will not exclude evidence of a crime if a police officer sees such evidence during an objectively reasonable traffic stop, even if the officer's actual, ulterior motivation for performing the traffic stop was not the desire to enforce traffic laws. *Whren*, 517 U.S. at 813.

*Whren* does not say, however, that an officer who undertakes such a stop is a reliable witness with respect to whether the actions of the person in the stopped car objectively indicated that the person must be armed and dangerous.

It is the most common of common sense that officers who undertake a pretextual traffic stop in order to catch criminal will not, once the car is stopped, become any less moved by that desire. They decided to follow the car and ultimately stop it on the hunch or stereotype that the occupants were wrongdoers and wanted to catch them. It is only reasonable to believe that that motivation might, consciously or unconsciously, cause the officers to read the situation before them in a way that furthers that motive.

Put simply, to a man with a hammer, everything will look like a nail. That impulse is both human and understandable. And it is critically important to recognize it in these cases. Under *Whren*, the officer's subjective intent for deciding to follow a car and to make a stop is not relevant if there was a traffic violation that justified that stop. But what remains critically relevant is the accuracy of that same officer's testimony regarding whether certain things—a tug of the pants, for instance—suggest that the individual in the car is armed and dangerous.

As this case illustrates, these are often nebulous, ambiguous things: shifting in one's seat, adjusting one's pants, a protestation of innocence. The officers testify that in their experience the particular ambiguous acts bespeak the existence of a gun, and hence justify a search. That may perhaps be so, and the district court

23

must decide whether that is in fact the case.[11] But in deciding whether it is so, or whether it represents an extension of the understandable motivation that led the officer to make a pretextual stop in the first place, I believe the district court *should expressly* consider the officers' motivation in making the pretextual stop and everything that led up to it. Nothing in *Whren* dictates otherwise.

The majority maintains that there is no reason to believe that an officer who has engaged in a pretextual stop may be inclined to exaggerate the description of a defendant's potentially dangerous conduct. Maj. Op. 45 n.65. I believe that the ordinary person would find that position illogical and contrary to human nature.

The majority also implies that it would be inconvenient to have a district judge make credibility findings whenever an officer has engaged in a pretextual traffic stop. I think the inconvenience is minor compared to the risk of taking for granted an inaccurate description of a defendant's dangerousness. But even apart from whether an explicit finding of an officer's credibility should be made, I think

---

[11] Generally speaking, the undisputed evidence in *Floyd* suggests otherwise. Of the millions of *Terry*-stops undertaken in New York City from 2004 to 2009, the two most commonly marked justifications indicating the reasons for the stop were "Furtive Movements" and "High Crime Area"—42% for the former and 55% for the latter. As it turned out, however, during those years stops were 22% *more* likely to result in arrest if "High Crime Area" was *not* checked, and 18% *more* likely to result in arrest if "Furtive Movements" was *not* checked. *Floyd*, 959 F. Supp. 2d at 574–75.

a remand in this case is appropriate. The district courts, like many judges on this court, assume that *Whren* requires us to ignore wholly the fact of the pretext. It would be helpful—indeed, I believe it is necessary—to let district courts know that they are free to take the facts suggesting that a stop was pretextual into account when evaluating the reliability of the officer's account of a defendant's dangerousness. This would be helpful even if no express finding by the district court were required, because today there is no reason to believe that a district court feels free to look on what an officer says with skepticism, given the prevailing and, to my mind, incorrect and overly broad reading of *Whren*.

It is and must be permitted, wise, and appropriate for a district court in cases of this sort to take the facts that led to the legal stop into account. And with these facts expressly in mind evaluate an officer's testimony when determining whether the specific criteria identified by the officer would really cause a reasonable police officer to be concerned as to whether the person stopped was armed and dangerous.

I believe it was just such a view that led the New York court acting under state law to find the search in this very case to be unreasonable. *See* App'x 20–27.

25

I do not say that the district court should necessarily reach the same conclusion. But I do believe that the law in this area would be better served if we required district courts to consider the nature and motivation of the officers who made the traffic stop in deciding whether the testimony of these same officers constitutes objective evidence of danger to the police after that stop.

IV.

The law in this area must balance the extremely important interest in police safety with the constitutionally mandated protection of citizens from demeaning and offensive searches and seizures. That balance is what the Fourth Amendment's requirement of reasonableness demands of us. I believe that the interplay of the exclusionary rule, qualified immunity, and the difficulty of envisioning ourselves in situations that, as a practical matter, are unlikely to affect us, has led courts to strike that balance in a most unfortunate way.

I recognize that where that balance has been struck in previous cases makes this case a close one. Nevertheless, I believe the district court and the *en banc* majority have erred in both going beyond existing law and in reading too broadly what existing law requires. There is nothing in *Whren* and its sequelae that keeps us from requiring the district court to consider the pretextual nature of

an original traffic stop when evaluating an officer's subsequent testimony as to whether ambiguous acts bespeak danger. And existing law, in other circuits and suggested by the Supreme Court, requires that demeaning additional seizures, such as entailed by orders to spread eagle, be justified on the basis of evidence *then* available. Because the district court failed to do either examination, and because the majority of this court affirms that failure, I respectfully but sadly dissent.

I would vacate and remand the district court's judgment and order it to consider whether there was in fact sufficient, believable evidence, available at the time the order to spread eagle was issued, to justify ordering Weaver to so demean himself.

DENNY CHIN, *Circuit Judge*, dissenting, joined by GUIDO CALABRESI and ROSEMARY

S. POOLER, *Circuit Judges*:

"[T]he ultimate touchstone of the Fourth Amendment is

'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). What

happened here to defendant-appellant Calvin Weaver was not reasonable.

The police officers saw Weaver, a Black man wearing a hoodie,

walking on the street in the Near Westside of Syracuse around 5 p.m. He stared

at their car -- an unmarked vehicle (with tinted windows) moving slowly -- for a

few seconds, and he hitched up with one hand his sagging pants. The officers

were suspicious and continued to watch as Weaver approached a grey sedan and

entered it on the passenger side. The officers followed in their car.[1] When the

grey sedan stopped at a corner where it could only make a right turn and only

then activated its turn signal, the officers pulled the grey sedan over, for failing

---

[1] The majority writes that the officers "encountered the sedan," Maj. Op. at 6, and "after seeing Weaver get into the gray sedan on Merriman Street, they did not stop it or follow it," *id.* at 46 n.66. The majority thus suggests that it was coincidence that "[t]he officers re-encountered the sedan on Davis Street." *Id.* Not so. Quonce testified that he was "kind of looking for the car" after he drove eastbound and saw the grey sedan begin to drive west. App'x at 134. The officers then made the two immediate rights so that they would also be driving west, at which time they observed the grey sedan, "caught up to the vehicle," and proceeded to follow it. App'x at 98. It is apparent the officers were interested in the sedan *because* Weaver entered it.

to signal at least 100 feet before the turn. The purported traffic violation was an obvious pretext for the officers to stop the vehicle.

After the officers approached the sedan, its occupants complied fully with the officers' instructions. The officers saw Weaver squirming in his seat and making a downward motion with his hands around his pelvic area. The officers ordered Weaver out of the car. Although they did not see any bulges or outlines of a weapon or see him reach underneath his clothing, they ordered him to assume a spread-eagle position with his hands on the trunk of the car, in the middle of a four-way street in full public view. Weaver complied.

Police officers may frisk an occupant of a vehicle only when they "harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). Did the police officers here have reasonable suspicion that Weaver was "armed and dangerous?" I think not. The brief stare at a slowly moving and unmarked vehicle with tinted windows and the "upward tug" of sagging pants tell us nothing. The failure of the driver to signal at least 100 feet before the turn likewise is of no moment; although the delay in signaling provided a basis for a pretextual stop, the delay did not suggest in any way that Weaver -- a passenger -- was "armed and

dangerous."  The squirming in the seat and pushing down motion arguably were suggestive of an intent to hide something, but given the absence of bulges or outlines of a weapon or anything else specific and concrete, these actions likewise did not suggest the presence of a weapon or the threat of danger.  *See United States v. Hussain*, 835 F.3d 307, 316 (2d Cir. 2016) (during a car stop, even if an officer suspects "that [the driver] was not licensed to drive, that he was under the influence of alcohol or narcotics, *that he was hiding contraband*, and so on," the officer cannot search the driver absent suspicion that he was "*dangerous*" (first emphasis added)).  "Zero plus zero is zero."  *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 138 F.3d 33, 38 (2d Cir.), *cert. denied sub nom. In re Klayman*, 525 U.S. 874 (1998).[2]

---

[2]    The Government relies on three other facts that it claims supports the existence of reasonable suspicion:  (1) the stop occurred in a "high-crime area," (2) another passenger opened his door as soon as the car was pulled over, and (3) Weaver "claimed that he did not have anything" before the officers questioned him.  Appellee's Br. at 10.  These facts add little to the analysis.  Even assuming this was a high-crime area, it was only approximately 5 p.m., and it was light enough outside that the officers did not need to use their headlights or flashlights.  Further, it is simply not reasonable to infer that an individual is armed and dangerous because he appears fidgety when approached by police, "even in a high-crime neighborhood."  *United States v. McKoy*, 428 F.3d 38, 41 (1st Cir. 2005); *see id* at 40 (frisk was unreasonable where officers relied on "(1) the dangerousness of the neighborhood and (2) [the driver's] nervous appearance and movements inside the car").  And it was another passenger, not Weaver, who opened his door, and that passenger immediately closed the door when instructed by the police officers to do so.  Finally, Weaver's response that he did not have anything on

3

It is apparent that from the moment they first saw him, the police officers were suspicious of Weaver, a Black man wearing a hoodie, even though he did not appear to be doing anything remotely illegal. They had a hunch that he was carrying a weapon or contraband or was otherwise up to no good, and while that hunch may have turned out to be correct, it was a hunch nevertheless. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("The officer, of course, must be able to articulate something more than an inchoate and unparticularized suspicion or 'hunch.'" (internal quotation marks omitted)). And far more often, these hunches turn out to be baseless. *See Floyd v. City of New York*, 959 F. Supp. 2d 540, 559 (S.D.N.Y. 2013) (of 4.4 million stops made by New York Police Department officers over an approximately eight-year span, guns were seized only 0.1% of the time, while "other contraband" was seized only 1.8% of the time). The officers here identified nothing particularized to warrant the intrusion on Weaver's liberty that followed, including ordering him to assume a demeaning spread-eagle position in the middle of a four-way street in full public view. *See City of Ontario v. Quon*, 560 U.S. 746, 755-56 (2010) ("The [Fourth]

---

him after being directed to show his hands surely does not suggest that he *had* a weapon -- that he was armed and dangerous.

4

Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government . . . ." (quoting *Skinner v. Ry. Lab. Execs. Ass'n*, 489 U.S. 602, 613-14 (1989)); *Schmerber v. California*, 384 U.S. 757, 767 (1966) ("The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State.").

Judges Calabresi and Pooler have addressed a number of troubling concerns in their dissents, including the legacy of *Whren v. United States*, 517 U.S. 806 (1996), and pretextual stops; the notion that looking at an unmarked car allows a reasonable inference that a person is armed and dangerous; the use of the "high-crime area" justification where reasonable suspicion is lacking; and the notion that an order to assume a spread-eagle position does not have certain Fourth Amendment implications. I share these concerns, and I join fully in their dissents. But even taking the law as it exists, without adopting any "novel" theories of law, in my view the police officers here did not have reasonable suspicion that Weaver was armed and dangerous, and the police officers acted unreasonably in subjecting him to a spread-eagled search.

5

The majority makes the point that neither it nor the district court "even mention[s] Weaver's race." Maj. Op. at 62. It concludes that there are "simply no grounds for believing that [Weaver's race or racial bias] would have any bearing on the outcome of this case." *Id*. at 64. That race was not mentioned by the majority or the district court in their Fourth Amendment analyses does not mean that race did not impact the police officers' actions.

Was race a factor? Would the officers have considered Weaver's staring at their car and hitching up his pants suspicious if he had been White? Would the officers have bothered to make a pretextual stop in the circumstances here -- stopping a car for failing to signal at least 100 feet before a corner where only a right turn could be made and the car did indeed signal once it reached the corner -- if the occupants of the vehicle had been White? Would the officers have ordered Weaver to exit the vehicle and assume a spread-eagle position with his hands against the trunk if Weaver had been White?

Of course, we do not know for sure whether racial bias, implicit or otherwise, had any bearing on the outcome of the case.[3] We do know, however,

---

[3] *See* Jerry Kang, Judge Mark Bennett, Devon Carbado, Pam Casey, Nilanjana Dasgupta, David Faigman, Rachel Godsil, Anthony G. Greenwald, Justin Lvinson, & Jennifer Mnookin, *Implicit Bias in the Courtroom*, 59 U.C.L.A. L. Rev. 1124, 1135 (2012) ("If we implicitly associate certain groups, such as African Americans, with certain

that the officers repeatedly noted Weaver's race and appearance in their contemporaneous reports as well as in their testimony. App'x at 33-34, 37, 59, 65, 95, 116. We also know as a general matter that Blacks are stopped by police officers far more often than Whites[4] and that Blacks are arrested and incarcerated at far higher rates than Whites.[5] And we also know that the officers here grasped

---

attributes, such as criminality, then it should not be surprising that police may behave in a manner consistent with those implicit stereotypes. In other words, biases could shape whether an officer decides to stop an individual for questioning in the first place, elects to interrogate briefly or at length, decides to frisk an individual, and concludes the encounter with an arrest versus a warning. These biases could contribute to the substantial racial disparities that have been widely documented in policing." (footnote omitted)).

[4]     *See* NACDL Amicus Br. at 6 n.3 ("black Chicagoans were subjected to 72% of all stops (even though they constituted just 32% of the city's population")); *id.* at 9 (over a one-year period in Los Angeles, "Blacks were stopped almost 260% more often than Whites, and . . . stopped Blacks were 127% more likely to be frisked than stopped Whites"); *id.* at 9-10 ("in Philadelphia in 2019 . . . Blacks and Latinos still accounted for 88% of all frisks, with 1 in 7.2 stops of Black pedestrians resulting in a frisk. In Washington D.C. in 2019, Black people made up over 90% of those who experienced a search or pat down of their person or property, and were more than six times more likely to be frisked than White people. And in New York between 2014 and 2017, 84% of all frisks occurred during stops of Black and Latino people whereas only 9% occurred during stops of White people." (footnotes omitted)).

[5]     *See Mandala v. NTT Data, Inc.*, 988 F.3d 664, 675 (2d Cir. 2021) (Chin, *J.,* dissenting) ("[A]s of 2010, 40% of prisoners in the United States were African American, while African Americans represented only 13% of the overall U.S. population . . . . [A]s of 2010, Black men were incarcerated at almost seven times the rate of White men: Black men were imprisoned at the rate of 3,074 per 100,000, while White men were imprisoned at the rate of 459 per 100,000. And much of this disparity cannot be attributed to the conduct of the individuals subjected to incarceration. For example, studies show that White and Black Americans are equally likely to use drugs and that White Americans are more likely to deal them; yet, Black Americans are arrested [and

at straws, tugging at the thinnest of rationalizations -- including Weaver's staring at their car, his hitching up of his pants, and the sedan's failure to signal until it reached the corner -- to justify their actions. *See Commonwealth v. Long*, 152 N.E.3d 725, 735 (Mass. 2020) ("This court has identified the discriminatory enforcement of traffic laws as particularly toxic. Years of data bear out what many have long known from experience: police stop drivers of color disproportionately more often than Caucasian drivers for insignificant violations (or provide no reason at all)." (internal quotation marks omitted)).

I respectfully dissent.

---

incarcerated] for drug crimes at far higher rates." (footnotes omitted)); *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) ("Blacks and Latinos are sentenced to incarceration at substantially higher rates than Whites, and Whites are sentenced to probation at substantially higher rates than Blacks and Latinos.").